Richard W. DE NOBEL; R. Wilson Rowland; John William Ryan; Joseph L. Goodman; Grant H. Snyder, Jr.; Helen A. Hess; Alvin A. Hess; Martin D. Bender; Kathryn C. Moy; Margaret L. Fisher; Emilda M. Costopoulos; Raymond L. Barrie; Frank W. Latson; William B. Lake; William C. Murphy, Jr.; Herbert S. Kline, Plaintiffs–Appellants,

v.

VITRO CORPORATION; Vitro Corporation Retirement Plan; Administrative Committee Vitro Corporation Retirement Plan; H.L. Dewberry, Chairman; Jack R. Lopez; Gary D. Funkhouser; Nancy E. Neuvelt; Kathy M. Hall, Benefits Coordinator, Defendants–Appellees.

No. 88–3104.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 6, 1988.

Decided Sept. 5, 1989.

Rehearing and Rehearing In Banc Denied Oct. 17, 1989.

---

John Robert Mooney (Hugh J. Beins, Paul A. Green, Beins, Alexrod & Osborne, P.C., Washington, D.C., on brief), for plaintiffs-appellants.

Graeme Webster Bush (Scott D. Michel, Eileen M. Mallon, Caplin & Drysdale, Chartered, Washington, D.C., on brief), for defendants-appellees.

Before PHILLIPS and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.

PHILLIPS, Circuit Judge:

Richard W. de Nobel and fifteen other retired employees of the Vitro Corporation (Vitro) appeal the summary judgment dis-

missal of their claims against Vitro under various provisions of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* In their amended complaint, the retirees claimed that the administrators of Vitro's ERISA-qualified retirement benefits trust miscalculated the amounts payable under the express terms of the retirement plan to "early retirees" electing to receive their benefits in a lump sum, rather than in a stream of monthly payments. Vitro of course claimed in response that it had paid the retirees all benefits to which they were entitled. Treating the dispute essentially as one over the correct interpretation of various provisions of the trust documents, the district court granted Vitro's motion for summary judgment, finding that the administrators' interpretation was consistent with the plain language of the plan, and that the company's resulting benefits determinations were therefore not arbitrary or capricious.

We now affirm, although for reasons somewhat different than those relied upon by the district court.

**I**

The relevant facts are not in dispute. Vitro's corporate retirement plan (hereinafter the "Plan") expressly provides for the payment of both "normal" (i.e., age–65) and "early" retirement benefits in the form of a "straight-life" annuity. If a Plan participant elects to retire early—that is, before age 65—her monthly annuity payment will be less than that to which she would have been entitled upon "normal" retirement at a later date, depending of course on the participant's age at the time of retirement. Plan § 3.04, Joint Appendix at 106.[1] As the parties agree, however, the actuarial "present value" of straight-life annuity

benefits paid to an early retiree is greater than the present value of the benefits the same employee would hypothetically receive if he waited to retire until age 65, inasmuch as early retirement benefits will typically be paid over a much longer period of time.

The Vitro Plan also permits retirees to "opt out" of the straight-life annuity and receive their benefits in any one of three optional forms. Relevant for present purposes are the following provisions of the official Plan documents:

*Article 4*

*Form of Retirement Benefit Payments*

4.01 *Normal Form of Retirement Benefit Payments*

(a) .... The normal form of payment of retirement benefits ... shall be in equal monthly installments commencing on a Participant's Normal Benefit Commencement Date [i.e., the first day of the first month following the Participant's sixty-fifth birthday] ... and payable on the first day of each month for the Participant's life.

\*　　\*　　\*　　\*　　\*　　\*

4.02 *Optional Forms of Retirement Benefit*

In lieu of receiving payments under the normal form as described in Section 4.01, a Participant who is entitled to a monthly benefit under Article 3 hereof[, which provides for "normal" and "early" retirement benefits,] may elect to have the *Actuarial Equivalent value of his monthly retirement benefit* paid under the "Ten–Year Certain and Life Option" (defined in subsection (a) below), the "Contingent Annuitant Option" (defined

---

1. Section 3.04(a) of the Plan provides that if a Participant elects ... to have his benefit payments commence prior to his Normal Benefit Commencement Date [i.e., the first day of the first month following the Participant's sixty-fifth birthday], he shall be entitled to receive a reduced normal retirement benefit. The amount of such benefit shall be the amount [of the normal retirement benefit the Participant would have received at age 65] reduced by 6⅔% for each full year up to five

full years (¹⁄₁₈₀th for each month up to 60 months) and further reduced by 3⅓% for each full year over five full years (¹⁄₃₆₀th for each month over 60 months) that the date the commencement of benefits payments he elects precedes his Normal Benefit Commencement Date, provided that such benefit commencement date shall not be earlier that the first day of the month following his 55th birthday.

Joint Appendix at 106.

in subsection (b) below) or the "Single–Sum Option" (defined in subsection (c) below)....

(a) *Ten–Year Certain and Life Option.* A Ten–Year Certain and Life Option means a monthly benefit which is *Actuarially Equivalent to the benefit under the form described in Section 4.01(a)* .... [Mechanics of computation omitted; involves guaranteed ten-year stream of payments to retiree or, in case of his death, to a named beneficiary.]

(b) *Contingent Annuitant Option.* A Contingent Annuitant Option means a monthly benefit which is *Actuarially Equivalent to the benefit under the form described in Section 4.01(a)* .... [Mechanics of computation omitted; involves stream of payments to retiree and then, after her death, to named beneficiary.]

(c) *Single–Sum Option.* A Single–Sum Option means a single-sum payment which is *Actuarially Equivalent to the benefit under the form described in Section 4.01(a).*

J.A. at 113, 115–16 (emphasis supplied). The Plan in turn defines the phrase "Actuarially Equivalent" as "equivalence in [present] value between two or more methods of payment," given certain computational assumptions not relevant here. Plan § 1.01, J.A. at 83. The quoted language from Article 4 would appear simply to provide, therefore, that a retiree selecting one of the "optional" forms of payment must ultimately receive benefits of the same "net present value" as those she would have received in a straight-life annuity.

What logically follows, we are now told, is that payments under each of the Article 4 options will be "Actuarially Equivalent" to each other. That is apparently not, however, what occurred as a matter of practice. Each of the plaintiffs in this case retired early and elected to receive their benefits in but one payment, under the "Single–Sum Option." What they ultimately discovered is that, as Vitro now concedes, the Plan's administrators calculated differently the benefits payable to early retirees who selected either the "Ten–Year Certain and Life" option or the "Contingent Annuitant" option and those payable to early retirees who selected the "Single–Sum Option." Employees who retired early and selected one of the first two options were paid the "Actuarial Equivalent"—again, the "net present value"—of the early retirement benefits they would have received had they chosen the standard, straight-life annuity form of payment. Early retirees who selected the Single–Sum Option, however, were only paid the "Actuarial Equivalent" of the normal, age–65 benefits they would have received had they waited to retire and selected the standard straight-life annuity. As a practical matter, this assertedly "discriminatory" policy in turn yielded Single–Sum Option benefits payments that were substantially less than those early retirees would have received if the computation had accounted for the greater "net present value" of straight-life early retirement benefits.

Of course, the plaintiffs now claim that they were shortchanged. First off, and as might be expected, they argue that the "plain language" of the Plan requires the administrators to pay early retirees selecting the Single–Sum Option the "Actuarial Equivalent" of their prospective monthly early retirement benefits, as computed according to the standard straight-life annuity formula. Vitro counters that, under the express terms of the plan documents, early retirees selecting one of the optional forms of payment are entitled only to benefits reflecting the "net present value" of whatever "normal," age–65 benefits might have been available had the employee delayed retirement. As indicated, the company concedes that it paid the actuarial equivalent of straight-life early retirement benefits to employees selecting options other than the Single–Sum form of payment, but argues that it was entitled to do so in an effort to encourage retirees not to draw out their vested benefits all at once.

The retirees also claim that, to the extent that the Plan as administered "penalizes" employees selecting the Single–Sum Option, it improperly "cashes out" vested, "nonforfeitable" benefits for less than their full net present value, hence in viola-

tion of ERISA § 204(d). 29 U.S.C. § 1054(d). And finally, the plaintiffs press a "federal common law contract" claim, arguing that Vitro's representations to employees in various informal "plan summaries" created a contract which the company now has breached.

The district court rejected each of these claims and granted Vitro's motion for summary judgment. This appeal followed.

## II

Because it is ultimately dispositive on the merits of this appeal, we turn first to the question of the standard of review that controls judicial analysis of whether Vitro improperly denied the retirees' claims for enhanced "Single–Sum Option" retirement benefits.

## A

■ At the time the district court decided this case, it was thought well-settled that an extremely narrow standard of review applied where the beneficiaries of an ERISA-qualified retirement plan challenged in the courts unfavorable benefits determinations by plan fiduciaries. The generally accepted view was that such determinations could not be disturbed by a reviewing court absent a clear showing that the determination was arbitrary and capricious. *See, e.g., Berry v. Ciba–Geigy Corp.*, 761 F.2d 1003, 1006 (4th Cir.1985).[2] This court, for example, emphasized repeatedly that this deferential standard of review applied even where the core dispute was one over the interpretation of the ambiguous terms of plan documents, *see, e.g., Holland v. Burlington Industries, Inc.*, 772 F.2d 1140, 1148 (4th Cir.1985), and that the standard itself was a

> *narrow* one. A reviewing court must consider whether the decision was based

on a consideration of the relevant factors and whether there has been a clear error of judgment.... [T]his inquiry into the facts is to be searching and careful, [but] the ultimate standard of review is a *narrow* one ..., [and t]he court is not empowered to substitute its judgment for that of the [plan fiduciaries].

*LeFebre v. Westinghouse Electric Corp.*, 747 F.2d 197, 204 (4th Cir.1984) (emphasis in original) (quoting *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974)).

Not all courts applying this narrow standard were wholly enamored of it, however, particularly as applied in cases where there were strong indications of biased or otherwise malfeasant administrative decision-making. Without abandoning the "arbitrary and capricious" formulation, these courts were willing to apply it somewhat less deferentially when they perceived the possibility of bias or conflict of interest on the plan fiduciary's part. *See, e.g., Jung v. FMC Corp.*, 755 F.2d 708, 711–12 (9th Cir. 1985) (less deference owed where plan administered by employer himself, and denial of benefits avoided "considerable outlay" of employer funds); *Dennard v. Richards Group, Inc.*, 681 F.2d 306, 314 (5th Cir. 1982) (proper in assessing "arbitrariness" to consider any "inference of lack of good faith"). Reflecting the same concern, this court and the Seventh Circuit expressly espoused a "flexible approach" under which judicial deference would vary in application of this single standard depending upon the apparent degree of impartiality in the fiduciaries' decisionmaking process. *See Holland*, 772 F.2d at 1149; *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1052–53 (7th Cir.1987). Going further, the Third Circuit had found the

---

**2.** The "arbitrary and capricious" formulation was widely used to describe the standard. *See, e.g., Moore v. Reynolds Metals Co. Retirement Program*, 740 F.2d 454, 457 (6th Cir.1984); *Short v. Central States, Southeast and Southwest Areas Pension Fund*, 729 F.2d 567, 571 (8th Cir. 1984); *Wolf v. National Shopmen Pension Fund*, 728 F.2d 182, 187 (3d Cir.1984); *Berg v. Board of Trustees, Local 705 Int'l Bhd. of Teamsters*

*Health and Welfare Fund*, 725 F.2d 68, 70 (7th Cir.1984); *Miles v. New York State Teamsters Conference Pension and Retirement Fund*, 698 F.2d 593, 599 (2d Cir.1983); *Dennard v. The Richards Group*, 681 F.2d 306, 313 (5th Cir. 1982); *Lowenstern v. International Ass'n of Machinists and Aerospace Workers*, 479 F.2d 1211, 1213 (D.C.Cir.1973).

arbitrary and capricious standard simply unacceptable where plan fiduciary bias or partiality, especially that flowing from a direct conflict of economic interest, was evident. In such cases, that court held that judicial review should be *de novo.* *See Bruch v. Firestone Tire and Rubber Co.,* 828 F.2d 134, 144–45 (3d Cir.1987). *Cf. Struble v. New Jersey Brewery Employees' Welfare Trust Fund,* 732 F.2d 325, 333–34 (3d Cir.1984).

It was against this background of differing lower court approaches that the Supreme Court, reviewing the Third Circuit's *Bruch* decision, swept the standard of review board clear in an opinion filed while this appeal was under submission. In *Firestone Tire & Rubber Co. v. Bruch,* ⸺ U.S. ⸺, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Court prescribed rules for judicial review of ERISA benefit denials which effectively supplanted all the lower court approaches above summarized—but without rejecting all the concepts of review embodied in those approaches. Those rules of course now control our disposition of this appeal.[3]

Noting that "ERISA abounds with the language and terminology of trust law," the Court held that determination of the appropriate standard of review for actions in which plan beneficiaries challenge benefit denials should be governed by the various common law rules delimiting the discretionary authority of fiduciaries. *Id.,* ⸺ U.S. at ⸺, 109 S.Ct. at 954. These "settled principles of trust law" necessarily required

> *de novo* review of benefit eligibility determinations based on plan interpretations.... As they do with contractual provisions, courts construe terms in trust agreements without deferring to either party's interpretation. "The extent of the duties and powers of a trustee is determined by the rules of law that are applicable to the situation, and not the

rules that the trustee or his attorney believes to be applicable, and by the terms of the trust *as the court may interpret them,* and not as they may be interpreted by the trustee himself or by his attorney." 3 W. Fratcher, Scott on Trusts § 201, at 221 [ (4th ed. 1988) ] (emphasis added). A trustee who is in doubt as to the interpretation of the instrument can protect himself by obtaining instructions from the court.... The terms of trusts created by written instruments are "determined by the provisions of the instrument as interpreted in light of all the circumstances and such other evidence of the intention of the settlor with respect to the trust as is not inadmissible." Restatement (Second) of Trusts § 4, Comment d (1959).

*Id.,* ⸺ U.S. at ⸺, 109 S.Ct. at 955 (some citations omitted). More importantly, application of the more deferential "arbitrary and capricious" standard of review would be inconsistent with the manifest purposes of the statute. "ERISA was enacted 'to promote the interests of employees and their beneficiaries in employee benefit plans ...,' and 'to protect contractually defined benefits.'" *Id.* (quoting *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983) and *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S. 134, 148, 105 S.Ct. 3085, 3093, 87 L.Ed.2d 96 (1985)). Application of a narrow standard of review would affirmatively frustrate these objectives because it would "afford less protection to employees and their beneficiaries than they enjoyed before ERISA was enacted." *Id.,* ⸺ U.S. at ⸺, 109 S.Ct. at 956.

The *Bruch* Court did not, however, do away with "deferential review" part and parcel. Instead, the Court expressly cautioned that "[t]rust principles make a deferential standard of review appropriate when a trustee exercises discretionary powers.... A trustee may be given power to

---

**3.** By order dated December 30, 1988, we held this case in abeyance pending issuance of the Supreme Court's opinion in *Bruch.* The Court decided the case on February 21, 1989, and we shortly thereafter invited the parties to submit supplemental briefs on the impact that decision should have, if any, on our disposition of the present case. The parties therefore have had ample opportunity to present argument on the critical "standard of review" questions discussed herein.

construe disputed or doubtful terms, and in such circumstances the trustee's interpretation will not be disturbed if reasonable." *Id.,* —— U.S. at ——, 109 S.Ct. at 954 (citations omitted). That said, the Court summarized the new rule to be applied in cases such as this one as follows:

> Consistent with established principles of trust law ..., a denial of benefits challenged under [ERISA] is to be reviewed under a *de novo* standard *unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.* Because we do not rest our decision on the concern for impartiality that guided the Court of Appeals, see 828 F.2d, at 143–46, we need not distinguish between types of plans or focus on the motivations of plan administrators and fiduciaries. Thus ..., the *de novo* standard of review applies regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under a possible or actual conflict of interest. Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a "factor[ ] in determining whether there is an abuse of discretion." Restatement (Second) of Trusts § 187, Comment d (1959).

*Id.,* —— U.S. at ——, 109 S.Ct. at 956–57 (emphasis supplied).

As we read *Bruch,* the Supreme Court has mandated total abandonment of the "arbitrary and capricious" formulation that guided the district court in the present case. The threshold question for reviewing courts is now whether the particular plan at issue vests in its administrators discretion either to settle disputed eligibility questions or to construe "doubtful" provisions of the plan itself. If the plan's fiduciaries are indeed entitled to exercise discretion of that sort, reviewing courts may disturb the challenged denial of benefits only upon a showing of procedural or substantive abuse. If not, the benefits determination at issue must be reviewed *de novo.*

The district court here of course did not review the Vitro administrators' decisions under the *Bruch* rules. Because we may do so here on a sufficiently developed record, however, we think it not in the interests of justice to remand for reconsideration by the district court. Instead, we undertake the review now mandated by *Bruch* in an independent exercise of our appellate review powers. 28 U.S.C. § 2106.

**B**

██ Notwithstanding the retirees' protestations to the contrary, we think it clear that the Vitro plan gives the defendant administrators broad discretion to pass on precisely the sort of "interpretive" questions that led to the present dispute. In relevant part, the Plan provides that the "Administrative Committee," which acts as the trust's "named fiduciary" under ERISA § 402(a), 29 U.S.C. § 1102(a),

> shall be generally responsible for the operation and administration of the Plan. To the extent that powers are not delegated to others pursuant to provisions of this Plan, the Committee shall have such powers as may be necessary to carry out the provisions of the Plan and to perform its duties hereunder, including, without limiting the generality of the foregoing, the power:
>
> \*    \*    \*    \*    \*    \*
>
> (e) *To determine all benefits and resolve all questions pertaining to the administration, interpretation and application of Plan provisions, either by rules of general applicability or by particular decisions, provided that all Employees similarly situated are treated in a uniform and nondiscriminatory manner.*

Plan § 10.03(e), J.A. at 137–38 (emphasis supplied). The retirees would have us hold that this broad language does not confer on the trustees "discretion" to resolve benefits eligibility disputes or to interpret doubtful provisions of the Plan, for the simple reason that the word "discretion" itself appears nowhere in the Plan documents. "[A]lthough the Administrative

Committee [is] empowered to decide issues of Plan interpretation ..., nowhere does the Plan expressly grant *discretionary* authority to the Committee in exercising these powers." Appellants' Supplemental Brief at 11 (emphasis in original). We perceive no principled basis, however, on which we could engage in semantic hairsplitting of that sort. There are obviously no magic words required to trigger the application of one or another standard of judicial review. In this setting, it instead need only appear on the face of the plan documents that the fiduciary has been "given [the] *power* to construe disputed or doubtful terms"—or to resolve disputes over benefits eligibility—in which case "the trustee's interpretation will not be disturbed if reasonable." *Bruch,* —— U.S. at ——, 109 S.Ct. at 954 (emphasis supplied).

Tacitly applying this common sense understanding of the principles enunciated in *Bruch,* we have before held that language far less broad than that involved here vests in plan fiduciaries a sufficient measure of discretionary authority to preclude *de novo* review of benefits determinations. In *Boyd v. United Mine Workers Health & Retirement Funds,* 873 F.2d 57, 59 (4th Cir.1989), for example, plan provisions giving administrators "the power of 'full and final determination as to all issues concerning eligibility for benefits' " and the authority " 'to promulgate rules and regulations to implement [the p]lan' " left in our minds "no question that the [t]rustees ... ha[d] discretionary authority." Invoking

*Bruch,* we in turn reviewed the challenged denial of benefits under the deferential "abuse of discretion" standard. *Id.*[4] As indicated, the administrators here enjoy what we think is even broader authority. They are expressly empowered to "determine all benefits and resolve all questions pertaining to the administration, interpretation and application of the Plan provisions."

That said, and because there is at the heart of this case nothing more than a dispute over the Vitro trustees' "interpretations" of unclear language found in the plan documents themselves, we are compelled under *Bruch* 's express mandate to apply the deferential "abuse of discretion" standard as we turn, finally, to the merits of the retirees' claims.

### III

As the *Bruch* Court made plain, what follows from the applicability of the abuse of discretion standard is that the trustee's interpretation of relevant provisions of the plan documents—hence the challenged denial of benefits—"will not be disturbed if *reasonable.*" —— U.S. at ——, 109 S.Ct. at 954 (emphasis supplied) (citing G. Bogert & G. Bogert, *Law of Trusts and Trustees* § 559, at 169–71 (rev. 2d ed. 1980)). *See also Van Boxel,* 836 F.2d at 1053 ("usual approach" where trust beneficiaries challenge fiduciaries' discretionary construction of governing instrument is for court to "review the trustees' interpretation to decide whether it was reasonable") (citing *Quinn v. Burlington Northern Inc. Pen-*

---

4. In several post-*Bruch* decisions, reviewing courts have construed plan documents as precluding *de novo* review—notwithstanding that the relevant provisions thereof apparently did not vest in the defendant administrators or fiduciaries "discretionary" authority *per se.* *See, e.g., Guy v. Southeastern Iron Workers' Welfare Fund,* 877 F.2d 37, 39 (11th Cir.1989) (*de novo* review under *Bruch* inappropriate where plan "confer[red] upon the trustees 'full and exclusive authority to determine all questions of coverage and eligibility' and 'full power to construe the provisions of [the] Trust' "); *Lowry v. Bankers Life & Casualty Retirement Plan,* 871 F.2d 522, 524–25 (5th Cir.1989) ("abuse of discretion" standard applied where governing instrument "grant[ed] permissive authority to the [administrators] to 'interpret and construe' the [plan] and the power 'to determine all questions of

eligibility and status' "); *Retirement and Sec. Program for Employees of Nat'l Rural Elec. Coop. Ass'n v. Oglethorpe Power Corp. Retirement Income Plan,* 712 F.Supp. 223, 226 (D.D.C. 1989) (*de novo* review inappropriate where plan documents vested in trustees "authority to determine all questions arising in connection with the [plan], including its interpretation"); *Ferrara v. Allentown Physician Anesthesia Associates, Inc.,* 711 F.Supp. 206, 209 (E.D.Pa.1989) (under *Bruch,* trust language providing that " '[t]he Plan Administrator shall administer the Plan in accordance with its terms and shall have the power to determine all questions arising in connection with the administration, interpretation, and application of the Plan' " gave fiduciaries "sufficient discretionary authority in interpreting plan language" that deferential standard of review applied).

*sion Plan,* 664 F.2d 675, 678 (8th Cir. 1981)). Of course, inquiry into the "reasonableness" of fiduciaries' interpretations of disputed plan language was considered relevant even under the now abandoned arbitrary and capricious standard for the review of benefits denials in ERISA cases. *See, e.g., Dennard,* 681 F.2d at 314 ("factors to be considered in applying the arbitrary and capricious standard" include analysis of "reasonableness" of interpretation offered by plan administrators) (citing *Bayles v. Central States, Southeast and Southwest Areas Pension Fund,* 602 F.2d 97, 100 (5th Cir.1979)); *Morgan v. Mullins,* 643 F.2d 1320, 1323 (8th Cir.1981) (application of arbitrary and capricious standard requires "examin[ation of] the reasonableness of the Trustees' interpretation" of disputed language); *Lowenstern v. International Ass'n of Machinists and Aerospace Workers,* 479 F.2d 1211, 1213 (D.C.Cir. 1973) (under arbitrary and capricious standard, court owes deference to plan administrators if parties have simply offered "reasonable ..., competing interpretations of the Plan"). It is in turn possible to draw from a number of pre-*Bruch* cases fairly straightforward rules to guide our analysis of whether the Vitro trustees abused their discretion by interpreting and applying the plan provisions here at issue as they did. We must give due consideration, for example, to whether the administrators' interpretation is consistent with the "goals of the plan," *Holland,* 772 F.2d at 1149; whether it might render some language in the plan documents "meaningless," *Bayles,* 602 F.2d at 100, or internally inconsistent, *Reiherzer v. Shannon,* 581 F.2d 1266, 1273–74 (7th Cir.1978); whether the challenged interpretation is at odds with the procedural and substantive requirements of ERISA itself, *Blau v. Del Monte Corp.,* 748 F.2d 1348, 1353 (9th Cir.1984); whether the provisions at issue have been applied "consistently," *Morgan,* 643 F.2d at 1324 n. 4; and of course whether the fiduciaries' interpretation is "contrary to the clear language of the [p]lan." *Dennard,* 681 F.2d at 316.

The dispositive principle remains, however, that where plan fiduciaries have of- fered a "reasonable interpretation" of disputed provisions, "courts may not replace [it] with an interpretation of their own"— and therefore cannot disturb as an "abuse of discretion" the challenged benefits determination. *Holland,* 772 F.2d at 1149 (citing *LeFebre,* 747 F.2d at 204–05). And as will appear, it is precisely because we are constrained by this rule of "considered deference" that we cannot now interfere with the Vitro fiduciaries' ultimate decision to deny the retirees' claims for "enhanced benefits."

**A**

■ We have given the standard of review issue such considerable attention for the simple reason that, were we to consider *de novo* review appropriate, we might well hold for the retirees. Indeed, the appellants have offered an interpretation of the Plan which could be considered not only "reasonable," but "more reasonable" than Vitro's.

As we understand it, their claim is this. Determination of the "value" of any retirement benefits to which a Vitro Plan participant may be entitled is governed exclusively by the provisions of Article 3. Section 3.03 fixes the amount of "normal retirement benefits"; while § 3.04 expressly provides for "early retirement benefits" which, given the built-in "deferred annuity factor," are of greater "net present value" than the "normal," age–65 benefits to which an employee would be otherwise entitled if she waited to retire. It is of course in this sense, say the retirees, that Article 3 provides for the "subsidization" of early retirement benefits. Notwithstanding that, if such benefits are paid in the form of a standard, straight-life annuity, the sum an early retiree receives each month will be less than the periodic "normal" benefits payment to which he would have ultimately been entitled, the "net present value" of early retirement benefits paid pursuant to § 3.04 still exceeds that of normal, age–65 benefits available under § 3.03.

Article 4, the appellants argue, serves a more limited purpose. It speaks not to the benchmark "values" of plan benefits

(which are fixed under Article 3), but instead only to the "forms of payment" in which, at the option of the retiree, such benefits may be disbursed. Under § 4.01(a), the "normal form of payment" is a standard, straight-life annuity. Thus, if she fails to select an "optional form of payment," a retiree will receive her benefits—the "net present value" of which will have already been determined under Article 3—in a stream of monthly payments continuing until the time of her death. Alternatively, if the retiree chooses one of the § 4.02 "options," he will receive his benefits in monthly payments under one of two "fixed term" annuities, or in a single lump sum payable at the time of retirement. Selection of any one of the three § 4.02 options will yield benefit payments of the same "net present value" as the "normal form" monthly payments available under § 4.01(a)—that is, the "value" already fixed under Article 3—however, since §§ 4.02(a)–(c) explicitly require "actuarial equivalence" between payments under the standard, straight-life annuity and those available under the Article 4 "options."

What all of this purportedly suggests is that, if benefits are to be computed according to one of the § 4.02 options, they must remain actuarially equivalent to the monthly, straight-life annuity benefits a retiree would otherwise be entitled to receive under § 4.01(a). In turn, benefits paid under any of the Article 4 options must reflect the "values" fixed by Article 3—including of course any "subsidization" of early retirement benefits. As the retirees interpret the relevant provisions of the Vitro Plan, therefore, their "Single–Sum Option" payments should have been computed as follows. Under § 3.04 of the Plan, they were entitled to "subsidized" early retirement benefits—that is, benefits "enhanced" in net present value by a "deferred annuity factor." As Vitro concedes, had the retirees chosen to draw those benefits in the form of a straight-life annuity under § 4.01(a), any monthly payments they ultimately received would necessarily have reflected this subsidization of present value. In turn, and because § 4.02(c) requires that "Single–Sum Option" payments

be "actuarially equivalent" to the monthly straight-life annuity payments available under § 4.01(a), early retirees electing to receive their benefits in but one payment should have received an amount equal to the net present value of their (subsidized) monthly, early retirement benefits. Of course, what they received instead was a lump sum payment "actuarially equivalent" to the lesser net present value of the normal, age–65 benefits which they would have received had they waited to retire. To that extent, the early retirees here were therefore "undercompensated."

As indicated, what lies at the heart of this complex line of reasoning is a relatively simple premise. It is that, under the express terms of the Vitro Plan, retirees selecting the Single–Sum Option are entitled to a payment equal to the net present value of whatever monthly benefits they would otherwise have received had they chosen the standard, straight-life annuity. Thus, just as age–65 retirees selecting the Single–Sum Option would receive the net present value of their annuitized "normal" retirement benefits, early retirees selecting the option would receive the present value of annuitized early retirement benefits. That being the threshold claim, the retirees argue further that their interpretation of the Plan finds support not only in the provisions discussed above, but in language appearing elsewhere in the document. They rely heavily, for example, on the prefatory language of § 4.02, which provides that "a Participant *who is entitled to a monthly benefit under Article 3 hereof* may elect to have the Actuarial Equivalent value *of his monthly retirement benefit* paid under" one of the thereafter delineated optional forms of payment. The obvious suggestion is, appellants claim, that early retirees selecting the Single–Sum Option must receive the "actuarial equivalent" of the monthly benefits to which they would otherwise have been entitled—i.e., the "subsidized" early retirement benefits for which § 3.04 expressly provides.

Finally, and putting all else aside, the retirees urge us to consider the contextual import of §§ 4.01(a) and 4.02(a)–(c), read

"in tandem." What they suggest is that there is manifestly applicable here something akin to the "transitive property": *viz.*, "if A equals B, and B equals C, then A must equal C." The Plan expressly provides that payments under the "Ten–Year Certain and Life" and "Contingent Annuitant" options must be "actuarially equivalent" to the straight-life annuity benefits payable under § 4.01(a). Of course, under § 4.02(c), payments under the Single–Sum Option also must be equivalent to the net present value of benefits otherwise payable under § 4.01(a). What necessarily follows is that, regardless of what § 4.01(a) may provide, payments under each of the three Article 4 options must be actuarially equivalent to each other. Thus, to the extent that Vitro did not pay "equivalent" sums under each of the § 4.02 options, it computed the early retirees' Single–Sum benefits in contravention of the express language of the Plan.

What we mean to illustrate with this lengthy recitation of the appellants' position is nothing more than that it finds considerable support in the "plain language" of the Plan itself. Indeed, we consider the suggested interpretation of the governing instrument perfectly consistent with a careful reading of its express terms—vexatiously imprecise or ambiguous though they may be. That simply will not suffice, however, in the face of what we consider the countervailing "reasonableness" of the fiduciaries' alternative interpretation of the Plan documents.

Vitro's position is fairly straightforward. The company concedes that, under the express terms of § 4.02(c), all retirees—including those who retire before their sixty-fifth birthdays—must receive a "Single–Sum" payment actuarially equivalent to the monthly benefits available under § 4.01(a). Section 4.01(a)'s "benchmark" for the computation of "actuarial equivalence," however, is the net present value of "benefits [payable] in equal monthly installments *commencing on a Participant's Normal Benefit Commencement Date* [i.e., at age 65]." Thus, benefits paid to either an "age–65" or "early" retiree under one of the § 4.02 options need only be "actuarially

equivalent" to the normal, age–65 monthly benefits to which the Plan participant would otherwise have been entitled.

We consider this interpretation of the Plan's controlling provisions at least a "reasonable" one. Of course, that the retirees' position might be more subjectively compelling is of no moment. Here, the trust's fiduciaries have resolved patent ambiguities in the plain language of the governing instrument in a way that obviously leaves some questions unanswered, but that is nevertheless rational on its own merits, finding support as it does in the express terms of the Plan. The administrators' interpretation may leave as mere "surplusage," for example, the prefatory language of § 4.02. In a comparable way, however, the retirees' construction of the document would appear to render meaningless § 4.01(a)'s reference to "monthly installments commencing on a Participant's Normal Benefit Commencement Date." *Cf. Bayles*, 602 F.2d at 100. Along similar lines, we might question the fiduciaries' concededly "discriminatory" computation of the benefits payable under the alternative § 4.02 options. It obviously undermines the persuasiveness of their position that an early retiree's Single–Sum Option payment need only reflect the net present value of his or her "normal" monthly retirement benefits for the Plan administrators to have consistently computed the amounts payable to early retirees under the other Article 4 options on the basis of "actuarial equivalence" with monthly early retirement benefits. If we are to remain faithful to the "reasonableness" standard which applies in this case, however, we must accept the administrators' explanation that, while not required to do so by the terms of the Plan, they offered "enhanced" payments to early retirees not choosing the Single–Sum Option as an incentive for such employees to guarantee themselves a "lifetime income stream"—hence in furtherance of a "valid plan purpose." *See, e.g., Cook v. Pension Plan for Salaried Employees of Cyclops Corp.*, 801 F.2d 865, 867 (6th Cir.1986) (court obliged to defer to fiduciaries' interpretation of disputed language

where it appears "rationally related to a valid plan purpose"); *Holland*, 772 F.2d at 1149 (courts may not label "unreasonable" administrative interpretations that are consistent with legitimate purposes of the plan).

Perhaps most importantly, the defendant administrators adopted their now-challenged interpretation of Article 4 some 13 years ago. They have, moreover, administered the Plan accordingly ever since. We of course recognize that "being consistently wrong can hardly be sanctioned as right." *Dennard*, 681 F.2d at 318 (quoting *Snyder v. Titus*, 513 F.Supp. 926, 934 (E.D. Va.1981)). Where, as in this case, the reviewing court cannot say that the fiduciaries' construction of the trust documents is inconsistent with the plan's "plain language," however, consistency of interpretation counsels strongly in favor of judicial deference. *See Bayles*, 602 F.2d at 100.

The question of interpretation that lies at the heart of the parties' dispute in this case is an extremely close one. That alone, given that we must defer to any "reasonable" administrative construction of the Plan, constrains us to find here no "abuse of discretion"—presuming, of course, that the Vitro trustees operated under no substantial "conflict of interest." The question that remains, therefore, is whether the record before us bears out the retirees' allegations of administrative bias.

## B

■ The *Bruch* Court made clear that, even under the deferential "abuse of discretion" standard of review, evidence of administrative bias remains relevant. "[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor[ ]' in determining whether there is an abuse of discretion.'" *Bruch*, — U.S. at —, 109 S.Ct. at 956 (quoting Restatement (Second) of Trusts § 187, Comment d (1959)). Here, however, there simply is no evidence in the record to suggest that the Vitro administrators' benefit determinations were tainted by any such conflict of interest. The Vitro retire-

ment benefits trust is a fully funded, defined-benefit plan. Vitro of course makes contributions to the trust fund; but benefits decisions have an immediate impact only on the fund itself. In turn, Vitro incurs no direct, immediate expense as a result of benefits determinations favorable to Plan participants. In those circumstances, we obviously cannot attribute "presumptive bias" to the administrators—notwithstanding that they serve dual roles as company employees and pension plan fiduciaries. *Lowry v. Bankers Life & Casualty Retirement Plan*, 871 F.2d 522, 525–26 & n. 7 (5th Cir.1989).

The retirees would have us find that the trustees were necessarily operating under a conflict of interest because the Plan itself obviously saved substantial sums as a result of the challenged benefits denials. "[One] can only speculate how much of the Plan's $30 million in excess assets, composed of both employer and employee contributions, is [present] as a direct result" of the fiduciaries' "failure to 'enhance' the lump sum [payments under § 4.02(c) ] in a manner similar to all other benefits." Appellants' Br. at 25 n. 15. That plan administrators' decisions have had a favorable impact on the balance sheet of the trust itself, however, suggests no "conflict of interest." Fiduciaries are obligated to act not only in the best interests of beneficiaries, but with due regard for the preservation of trust assets. Adverse benefits determinations may well have saved considerable sums, but that may simply reflect that the trustees, bearing in mind the interests of *all* participants and beneficiaries, 29 U.S.C. § 1104(a)(1), made a considered decision to preserve the corpus of the trust, rather than grant a doubtful claim. This the statute affirmatively contemplates; and standing alone it clearly suggests no "presumptive bias."

What the retirees effectively seek, therefore, is a broad holding that the fiduciaries of fully funded, defined-benefit ERISA trusts cannot be considered "impartial" if they also serve as employees of the plan's sponsor. Courts have repeatedly rejected such claims, however, and we decline to

depart from the settled rule. *See, e.g., Local Union 2134, UMW of America v. Powhatan Fuel, Inc.,* 828 F.2d 710, 713 (11th Cir.1987); *McMahon v. McDowell,* 794 F.2d 100, 110 (3d Cir.1986); *Morse v. Stanley,* 732 F.2d 1139, 1146 (2d Cir.1984). That said, and on the basis of our finding that the challenged interpretation of the Vitro Plan was indeed "reasonable," we hold that the defendant administrators' decision to deny the plaintiffs' claims for "enhanced" benefits did not constitute an abuse of discretion.

## IV

■ Section 204(d) of ERISA, 29 U.S.C. § 1054(d), specifies the conditions under which the fiduciaries of a defined benefit plan may "buy back," with a single, lump sum payment, the plan's fixed liability for a participant's future pension benefits. Under this "cash out" provision—and under an identical provision of the Internal Revenue Code—any such payments must be at least equal to the "present value of [the beneficiary's] nonforfeitable benefit[s]." *Id.* § 1054(d)(2). *See also* I.R.C. § 411(a)(7)(B)(ii). What the appellants now claim, of course, is that the Vitro Plan administrators were required under the express terms of the statute to compute payments under the Single–Sum Option not on the basis of the "net present value" of normal, age–65 monthly benefits, but instead such that any lump sum payments were "actuarially equivalent" to the greater net present value of the monthly early retirement benefits to which the retirees would otherwise have been entitled.

The assumption necessarily embodied in this claim is that the monthly early retirement benefits available to the plaintiffs under § 3.04 of the Vitro Plan were "nonforfeitable"—at least within the meaning of ERISA § 204(d) and I.R.C. § 411(a)(7). We reject that assumption, however, on the basis both of an independent reading of the statute, and of our understanding of various Internal Revenue Service interpretive regulations.

Section 3(19) of ERISA defines a "nonforfeitable benefit" as "a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan." 29 U.S.C. § 1002(19). As the appellees point out, however, the scope of this definitional provision is considerably more limited than a casual reading might suggest. "[T]he statutory definition of 'nonforfeitable' assures that an employee's claim to the protected benefit is legally enforceable, *but it does not guarantee a particular amount or a method for calculating the benefit....* '[I]t is the claim to the benefit, rather than the benefit itself, that must be "unconditional" and "legally enforceable against the plan." ' " *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 512, 101 S.Ct. 1895, 1900, 68 L.Ed.2d 402 (1981) (quoting *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 446 U.S. 359, 371, 100 S.Ct. 1723, 1731, 64 L.Ed.2d 354 (1980)) (emphasis supplied).

What this intuitively suggests is that the retirees in this case enjoyed nothing more than a "nonforfeitable" right to receive early retirement benefits of some kind. *Alessi* would appear to make plain, in other words, that the plaintiffs cannot—even if their entitlement to monthly early retirement benefits be termed "nonforfeitable" —rely on ERISA's definitional provisions as the sole basis of their claim to an additional, independent right to have benefits payments computed in a given way. Of course, the retirees have not so limited their argument. To the contrary, their claim is that the "right" implicated here follows not only from the statutory definition of the term "nonforfeitable benefits," but also from the independent "cash out" rule embodied in ERISA § 204(d).

*Alessi* and *Nachman* remain important, however, when read in light of the courts' repeated recognition that there are two distinct "sources" of benefit nonforfeitability. The first is the statute itself, which devotes considerable attention to the question of what accrued benefits must be treated as nonforfeitable. Under ERISA § 203(a), for example, "[e]ach pension plan shall provide

that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age." 29 U.S.C. § 1053(a). Similarly, under § 203(a)(1), "an employee's rights in his accrued benefit derived from his own contributions [must be] nonforfeitable." *Id.* § 1053(a)(1).

An individual benefit plan might well provide for more extensive vesting than ERISA requires, however, by treating as "nonforfeitable" any number and variety of accrued benefits not expressly so denominated by the statute itself. Indeed, "ERISA leaves the question of what rights are vested by a plan largely to private parties to decide." *Dameron v. Sinai Hospital of Baltimore, Inc.*, 815 F.2d 975, 978 (4th Cir.1987) (citing *Alessi,* 451 U.S. at 511, 101 S.Ct. at 1900). So it is that a benefit might be considered "nonforfeitable" for either one of two reasons: because the statute treats it as such, or because the plan documents themselves contemplate nonforfeitable "vesting."

This in turn guides our analysis of whether, for the purpose of applying the § 204(d) cash out rules, the plaintiffs' asserted "right" to monthly early retirement benefits was indeed nonforfeitable. We note first that, at least as consistently interpreted by the courts, ERISA itself offers the retirees little help. On its face, the statute clearly "does not give an employee any nonforfeitable right to early retirement benefits." *McBarron v. S & T Industries, Inc.,* 771 F.2d 94, 99 (6th Cir. 1985). *See also Bencivenga v. Western Pennsylvania Teamsters and Employers Pension Fund,* 763 F.2d 574, 577–78 (3d Cir.1985) (ERISA does not protect "rights" to unfunded early retirement benefits); *Sutton v. Weirton Steel Division of Nat'l Steel Corp.,* 724 F.2d 406, 410 (4th Cir. 1983) (same); *Fine v. Semet,* 699 F.2d 1091, 1093 (11th Cir.1983) ("The Act imposes no obligation on a plan to pay benefits before an employee reaches normal retirement age. Any right to earlier benefits and a particular method of payment *must be found in the individual agreements.*")(citing *Pompano v. Michael Schiavone & Sons, Inc.,* 680 F.2d 911, 914

(2d Cir.1982)) (emphasis supplied); *Hernandez v. Southern Nevada Culinary & Bartenders Pension Trust,* 662 F.2d 617, 619 (9th Cir.1981) (ERISA does not require that vested retirement benefits be payable before normal retirement age). *Cf.* H.R. Rep. No. 807, 93d Cong., 2d Sess. 57, *reprinted in* 1974 U.S.Code Cong. & Admin. News 4639, 4670, 4726 (nonforfeitability/vesting rules of ERISA not intended to apply to "such items as the value of the right to receive benefits commencing at an age before normal retirement age"). In search of persuasive support for their threshold claim of a "nonforfeitable" entitlement to subsidized early retirement benefits, therefore, the retirees must look to the structure of the Vitro Plan itself.

The argument is fairly straightforward, and not without some surface appeal. From an early retiree's perspective, subsidized benefits are "unconditionally" available, in the sense that all the qualifying participant need do is retire. *Cf.* 29 C.F.R. § 2613.6(a) (1988) (Pension Benefit Guaranty Corporation regulation defining "nonforfeitable" benefit as one payable if the participant "has satisfied all of the conditions required of him or her under the provisions of the plan to establish entitlement to the benefit, except the submission of a formal application, retirement [or] completion of a required waiting period"). Such benefits are also "legally enforceable against the plan," 29 U.S.C. § 1002(19), since an early retiree obviously could compel the administrators to pay if he or she indeed qualified for the benefits under the express terms of the trust instrument. Thus, any subsidized early retirement benefits available under the Vitro Plan must be "nonforfeitable." *Id.*

The reasoning breaks down, however, when one considers what it is that the plaintiffs here ultimately seek. Vitro's early retirees selecting the Single–Sum Option received payments reflecting the net present value of unsubsidized "normal retirement benefits." What they now claim they should have been paid was the net

present value of subsidized, early retirement benefits. The difference, of course, is the subsidy itself—that is, the "enhancement" in the present value of monthly early retirement benefits attributable to § 3.04's use of a "deferred annuity factor." What the appellants in the end characterize as "nonforfeitable," therefore, is their asserted "right" to benefit subsidization. By its very nature, however, the early retirement benefits subsidy available under the Vitro Plan is "forfeitable." If a Plan participant retires early and draws his benefits in the form of an annuity, she will enjoy the full benefit of the § 3.04 subsidy. Subsidization will not be available, however, if the participant chooses to wait and retire at age 65.

The only point is that, under the express terms of the Plan, early retirement subsidies might become unavailable—that is, might be forfeited—depending on certain prospective "conditions." Were we to accept the appellants' argument that these subsidies constituted "nonforfeitable" benefits, we would then be compelled to hold in the inevitable next case that age–65 retirees who might earlier have qualified for early retirement also are entitled to receive the "net present value" of the § 3.04 subsidy.[5] This result the Plan obviously does not contemplate, and we decline to read into its provisions any such manifestly unintended rule.

Our holding that the Vitro Plan's early retirement subsidy is indeed "forfeitable," and that ERISA § 204(d)'s cash out provision therefore does not prohibit the Plan's administrators from computing early retirement Single–Sum Option payments as they have, finds considerable support in the IRS interpretive regulations governing application of the forfeitability rules of both ERISA itself and parallel provisions of the Internal Revenue Code.[6] Indeed, the IRS's most recent statement on the scope of I.R.C. § 411 would appear to sanction explicitly the very same benefits computation practices that are at issue in the present case.

A plan may have more than one optional form of benefit under which benefits may be paid. *There is no requirement that each form of benefit be the actuarial equivalent of all other benefit forms.* Thus, a plan could have a QJSA [qualified joint and survivor annuity] benefit form that has a larger actuarial value than a benefit payable as a single life annuity and the amount of a single sum optional form could be determined based on the single life annuity. *Similarly, a plan may provide for a retirement subsidy or an early retirement benefit that applies to the payment of a specific optional form. Whether these subsidies must be valued when calculating the amount of the single sum distribution depends on the plan provisions.... Thus, a plan may satisfy [the] requirements [of § 411] even though it has a subsidized joint and survivor annuity and determines a single sum distribution based on an unsubsidized single life annuity.*

---

**5.** Vitro provides an example that illustrates the point well.

[A]ssume that a plan provides a normal retirement benefit for a person retiring at age sixty-five of $1000 per month, and that it provides a *subsidized* early retirement benefit at age sixty of $900 per month ( ["subsidized" in the same sense that] straight actuarial reduction [of normal retirement benefits] would provide less than $900 per month at age sixty).
If the $900 early retirement benefit is considered [nonforfeitable], than [sic] a participant retiring at age sixty-five does *not* receive the actuarial equivalent of the [nonforfeitable] early retirement benefit because ... $1000 [per month] at age sixty-five is *less* than

the actuarial equivalent of $900 [per month] at age sixty. Under appellants' interpretation, the participant retiring at age sixty-five would [therefore] suffer a forfeiture ..., because the normal retirement benefit of $1000 per month is less than the actuarial equivalent of the subsidized early retirement benefit.

Appellees' Br. at 45 n. 93 (emphasis in original).

**6.** As indicated, I.R.C. § 411(a)(7), 26 U.S.C. § 411(a)(7), is essentially identical to § 204(d) of ERISA. The Internal Revenue Service is expressly empowered, moreover, to promulgate interpretive regulations covering the indicated provisions of both statutes. *See* 29 C.F.R. § 2530.200a–2.

53 Fed.Reg. 31,840 (1988) (emphasis supplied). *See also, e.g.,* 53 Fed.Reg. 26,059 (1988) (to be codified as Treas.Reg. § 1.411(d)(4), A–2(a)(2)(i)).[7] On its merits, we consider this statement both consistent with and justified by the express language of the statute; and the retirees have offered no substantive reason why we should question the correctness of the administrative interpretation. That said, and on the basis of our independent reading of the applicable statutory provisions, we will affirm the district court's holding that the Vitro Plan does not run afoul of either ERISA § 204(d) or I.R.C. § 411(a)(7).

## V

The retirees claim finally that Vitro is bound by certain "representations" made in "plan summaries" distributed to participating employees. These summaries assertedly suggest that, notwithstanding what the "official" plan documents may say, early retirees selecting the "Single–Sum Option" under Article 4 of the Vitro Plan will receive the "actuarial equivalent" of the monthly benefits they would otherwise have been paid in the form of a standard, straight-life annuity. Of course, as the appellants would now have it, the summaries not only bolster their interpretation of the Plan itself, but (more importantly) give rise to an independent cause of action under the "federal common law of contracts."

We need read no more than the introductory paragraphs of the summaries to reject this claim out of hand. Each summary expressly provides that, "[i]n the event of a

conflict between this booklet and a provision in the Plan document, the Plan document provision will control." *See, e.g.,* J.A. at 193. Courts have repeatedly upheld such disclaimers and rejected beneficiaries' attempts to rely on the independent terms of official or unofficial plan summaries. "[W]hen the summary ... expressly states that it is merely an outline of the pension plan and that the formal text of the plan governs in the event a question arises, the plaintiffs cannot rely on the general statements of the [summary] but must look to the plan itself." *Kolentus v. Avco Corp.,* 798 F.2d 949, 958 (7th Cir.1986) (citing cases). We therefore perceive no error in the district court's holding that the retirees were not entitled to relief on the basis of any "material" representations that the Vitro plan summaries might have included.

## VI

For all of the above reasons, the judgment of the district court is affirmed.

AFFIRMED.

---

**7.** This new regulation includes a discussion of the nonforfeitability rules similar to that quoted in the text.

> A plan may treat a participant as receiving his entire nonforfeitable accrued benefit under the plan if the participant receives his benefit in an optional form of benefit in an amount determined under the plan that is at least the actuarial equivalent of the employee's nonforfeitable accrued benefit payable at normal retirement age under the plan. This is true even though the participant could have elected to receive an optional form of benefit with a greater actuarial value than the value of the optional form received, such as an optional form including retirement-type subsidies, and

> without regard to whether such other, more valuable optional form could have commenced immediately or could have become available only upon the employee's future satisfaction of specified eligibility conditions.

53 Fed.Reg. 26,059 (1988) (to be codified as Treas.Reg. § 1.411(d)–4, A–2(a)(2)(i)).

> As the retirees point out, these regulations are not technically applicable here—both because they are not retroactive, and because they interpret subsections of I.R.C. § 411 not directly relevant to the case. We nevertheless consider the IRS's recent statements persuasive evidence of its general position on the proper application of benefit nonforfeitability rules.