George POOLE, Plaintiff,

v.

SEATTLE–FIRST NATIONAL BANK, a Washington corporation, and Seafirst Corporation, Defendants.

No. C–89–510–JLQ.

United States District Court, E.D. Washington.

June 11, 1990.

Richard B. Price, Omak, Wash., for plaintiff.

Bruce E.H. Johnson, Rich Birmingham, Davis Wright & Jones, Seattle, Wash., for defendants.

MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' CROSS–MOTION FOR SUMMARY JUDGMENT

QUACKENBUSH, Chief Judge.

BEFORE THE COURT are the plaintiff's Motion for Summary Judgment (Ct.Rec. 9) and the defendants' Cross–Motion for Summary Judgment (Ct.Rec. 19), heard with telephonic oral argument on May 18, 1990. Richard B. Price appeared on behalf of the plaintiff. Richard J. Birmingham represented the defendants. Having reviewed the record and heard from counsel, IT IS HEREBY ORDERED that plaintiff's Motion for Summary Judgment is DENIED; the defendants' Cross–Motion for Summary Judgment is GRANTED.

### Background

The plaintiff, Mr. George Poole, initially filed suit in this court on July 24, 1987, seeking recovery of short-term and long-term disability benefits pursuant to Seafirst Corporation's Long–Term Disability Plan ("Plan"). *See Poole v. Seattle First Nat'l Bank*, C–87–455–JLQ. By order dated July 28, 1988, *see id.*, Ct.Rec. 40, the court denied the defendant's summary judgment motion and remanded the case back to the defendant's Employee Benefit Committee ("Committee"). The Committee was ordered to reevaluate the plaintiff's claim, taking into account various specified factors that might not have been considered previously. On April 17, 1989, the Committee issued its written decision again denying the plaintiff any disability benefits under the Plan. *See* Ct.Rec. 22, Exhibit A. The plaintiff then filed the present action seeking judicial review of the Committee's ruling.

The plaintiff is a 64–year–old retired branch manager with Seafirst Bank who suffers from a relatively rare form of eye disease called recurrent central serous retinopathy. He has the condition in both eyes, although the condition has always been more prominent in the right eye. The disease is of unknown etiology, but it primarily occurs in males between the ages of 25 and 45. Symptoms include distortion of vision due to periods of swelling or fluid accumulation under the retina in the macular portion of the eye causing impairment of vision in varying degrees. In some people it causes no permanent deterioration of central vision. It tends to be recurrent, possibly occurring up to several times a year. With each recurrence there is usually some permanent retinal damage and with each recurrence there is apt to be further visual deterioration that may be permanent. In 80 to 90 percent of the patients with this condition, any vision impairment clears up spontaneously and the vision returns to normal or near normal. Patients usually have the recurrences in only one eye; however, 5 to 10 percent of the patients have recurrences in both eyes. Also, among only 5 to 10 percent of the cases, vision eventually deteriorates to worse than 20/40.

The plaintiff first experienced symptoms of the disease in 1961. He continued working for Seafirst despite suffering recurrences of the disease in both eyes over the next twenty plus years. The plaintiff's medical history shows that, during this period, he experienced a higher than normal frequency of recurrences; he suffered symptoms through age 58 which is some 13 years beyond the time when it is expected that such episodes would subside; and his vision deteriorated beyond the range of damage experienced by the vast majority of patients with this condition. During the flare-up episodes, the plaintiff would either take sick leave or go to work and delegate certain of his job functions to other bank personnel until the symptoms passed.

In 1982, the plaintiff suffered a final recurrence of central serous retinopathy. At that time, the plaintiff's treating physician, Dr. James Thorn, made statements that led the plaintiff to believe that his problem was related to stress on the job. The plaintiff's superiors, Mr. John Moen and Mr. Robert Hague, also became increasingly concerned about Mr. Poole's failing eyesight and urged him to take an early retirement. The plaintiff ultimately

made the decision to retire in March 1982, with the understanding that his decision would not preclude future disability benefits should he qualify under the Plan. It appears that Mr. Poole has had no recurrence of the disease since his retirement in 1982.

After his retirement, the plaintiff discussed submitting a formal disability claim with Dr. Thorn and company personnel. The formal application did not fit this particular condition and Mr. Poole was encouraged to seek an informal revue of his situation. The defendant agreed to determine whether the plaintiff, in fact, was disabled on an informal basis, giving the plaintiff the opportunity to submit anything he could to establish his claim. In April 1985, after receiving letters from several physicians, including Dr. Thorn, the defendant sent the plaintiff a letter stating that the Committee had determined that under the terms of the Plan he was not disabled at the time of his retirement. It was at this point that the plaintiff filed his original action in state court—the case ultimately being removed to federal court and thereafter remanded back to the Committee.

On remand, the Committee again denied Mr. Poole's claim for disability benefits, but only after considering numerous factors and a voluminous amount of evidence, including the matters set forth in the previous order of the court, and making written findings setting forth the reasons for its decision. *See* Ct.Rec. 22, Exhibit A. The gist of the Committee's determination is summed up in the following paragraph:

The Committee found that at the time of your retirement from Seattle–First National Bank (the "Bank") in 1982 you had sufficient visual acuity to perform the essential duties of your occupation. Therefore, the Committee has found that you were not disabled when you retired from the Bank in 1982. You also argued that although you had sufficient visual acuity in 1982 to perform your job, it was likely that your vision would rapidly deteriorate (to the point of blindness) if you remained on the job. The Committee has found no concrete scientific evidence that supports this position. In the absence of such evidence, the Committee will continue to interpret the Disability Plan as it has done in the past. To obtain disability payments under the Plan, an employee, at the time of an illness of [sic] injury, must demonstrate the complete inability to perform the essential duties of his occupation. The Committee will not award disability payments based on speculation, conjecture or a "guess" as to what may happen in the future. For these reasons, your claim for disability payments has been denied. Because the Committee found that you were not disabled at the time you left the active employment of the Bank, the Committee need not reach the issue of whether you are now permanently disabled, although it is Dr. Millay's opinion that you are not currently disabled.

*Id.* at 1–2. In arriving at this conclusion, the Committee considered evidence that was partially conflicting, thus forcing the Committee to weigh the various statements and opinions. It is necessary, therefore, to set out the evidence in some detail.

The Committee first considered the plaintiff's testimony with regard to the effects of the disease, the reasons for his decision to retire, including the fear of permanent and total blindness, the suggestions of his superiors that he take an early retirement, and the reasons why he waited until 1982 to cease working. The Committee found, however, that the plaintiff had sufficient visual acuity to preclude disability in 1982 and that the plaintiff's decision to retire was wholly voluntary.

The Committee also considered the statements of Mr. Richard Price, the plaintiff's attorney, in which he pointed out that the risk of staying on the job and becoming blind was unreasonable, and that retirement was the only reasonable method by which the plaintiff could deal with the situation. Mr. Price also noted, and the Committee accepted as fact, that all the physicians that had examined the plaintiff indicated that (1) his visual acuity was somewhat worse than normal for people with the disease, (2) the plaintiff had higher frequencies of attacks than normal, (3) he

was not in an unusual age class for the disease when it first occurred, (4) it was unusual to have the disease in both eyes, and (5) the deterioration of the plaintiff's right eye vision was worse than normal. Nonetheless, citing the conclusions of the various medical doctors (set out below), the Committee found that the plaintiff was not disabled at the time of retirement and that there was no scientific evidence to support Mr. Price's hypothesis that the plaintiff would have become blind had he remained on the job at Seafirst.

By far the most relied upon evidence came in the form of statements, deposition testimony, and correspondence from three separate physicians: Dr. Thorn, Dr. Steven Guzak, and Dr. Robert Millay.

Dr. Thorn, the plaintiff's treating physician throughout the relevant period, is an ophthalmologist but not a retinal specialist. In his statement, Dr. Thorn offered the opinion that the plaintiff was and is totally disabled. The Committee, however, discounted this statement as being limited to those periods when the disease was exhibiting active symptoms, at which times the plaintiff was being paid sick leave from the Bank. Dr. Thorn's response to a specific question in the statement is the basis for the Committee's finding.

> As indicated, on any given day Mr. Poole could probably perform whatever duties might be required of him. Again, as stated previously, during the exacerbations of his disease process, when his vision is affected, he probably could not perform his duties, but at other times could easily do so.

Ct. Rec. 22, Exhibit F. Dr. Thorn further stated, however, that

> [because his] records indicate that Mr. Poole has not experienced any exacerbation of his retinopathy since leaving the bank in April, 1982[, there is support for the] belief, with what little information is available to the medical community regarding this disease process, that stress in certain individuals can be a factor in recurrence.

*Id.* But, in his deposition, Dr. Thorn admitted that there is no medical evidence that would support his conclusion. *Id.*, Exhibit K, at 16.

In 1982, Dr. Thorn referred the plaintiff to Dr. Guzak, a retinal specialist. Dr. Guzak examined the plaintiff only once, in October 1982, and offered his opinion that the plaintiff was not disabled. He stated:

> At the time of his examination, Oct. 5th 1982 the patient's vision was sufficient to perform the essential duties as a banker. He probably had periods of time when his eye disease was active when he could not see well enough to perform those duties but I do not have information to determine how often or how long or how many these periods were.

*Id.*, Exhibit E. With regard to the element of stress, Dr. Guzak stated as follows in a subsequent letter:

> Although it certainly is true that the episodes of central serous seem, on occasion, to be associated with stress, I am not certain that one can implicate stress as the etiologic factor on the basis of our present knowledge.

*Id.*, Exhibit H. Finally, in a letter dated March 7, 1989, Dr. Guzak stated: "As removal of stress has not been shown to affect the course of this disease, I would not recommend retirement as a form of treatment or to prevent recurrent activation of the process." *Id.*, Exhibit A.

Dr. Millay is a retinal specialist retained by the defendant to offer his medical opinion in this matter. Dr. Millay performed a study on the plaintiff in November 1988. In his statement, Dr. Millay opines that, based on the Snellen Acuity Test, the plaintiff was not disabled prior to his retirement in 1982. He states that the plaintiff's "vision in March 1982 OD 20/50 and OS 20/20 should have been adequate for office tasks." *Id.*, Exhibit G. He states further that "[e]ven at the present time it might be possible for Mr. Poole to perform some of the tasks of office work especially with low vision aids." *Id.* With regard to the stress element, Dr. Millay commented:

> Emotional upset and more recently type A behavior personality have been implicated as possible causative factors in central serous retinopathy. The most com-

plete article on this particular aspect of central serous retinopathy has observed the following "of no significance is factor J which measures a patient's employment setting," implying at least in his study that the work setting had no definable association with central serous retinopathy. He further goes on to say that "the mechanism and the degree of the behavioral influence on central serous retinopathy must undoubtedly remain open to question until further evidence supports the concept that an intense and/or sustained behavioral pattern can influence or evoke through physiologic means the development of pathologic disturbance of the eye."

*Id.,* Exhibit H.

Finally, the Committee considered certain correspondence from the plaintiff's superiors, Mr. Moen and Mr. Hague. *See id.,* Exhibit M. From this, the Committee found that both individuals were extremely concerned about the plaintiff's health and urged the plaintiff to retire, but that the decision to retire was wholly voluntary with the plaintiff.

### The Defendant's Plan

Several provisions of the defendant's Long–Term Disability Plan are of particular importance to the analysis that follows. First, the term "disability" is defined as the "complete inability of an employee, due to sickness or injury, to perform the essential duties pertaining to his occupation." Ct. Rec. 22, Exhibit O, at 2. After 24 months of receiving disability payments, the employee must establish "total disability," which is defined as the "complete inability of the employee, due to sickness or injury, to perform the duties of any reasonable occupation for which he is or could become qualified by training, education or experience." *Id.*

Second, the Plan sets forth the duties, obligations, and level of discretion of the Committee in carrying out its intended purpose.

The existence of disability shall be determined by the Employee Benefit Committee in its sole discretion. The Committee will require medical evidence both initially and thereafter during any period of alleged disability. Such evidence shall be in such amounts and in such form as the Committee in its discretion may require.

*Id.* at 3. If a disability is found to exist, "[a] covered employee shall qualify for benefits hereunder in the event of his disability arising from a nonoccupational injury or sickness." *Id.* The rights and duties of the Committee are defined in relevant part as follows:

The Committee shall be the administrator and named fiduciary of the Plan within the meaning of the Employee Retirement Income Security Act of 1974, as amended. The Committee, on behalf of the participants and their beneficiaries, shall have the authority to control and manage the operation and administration of the Plan and shall have all powers necessary to accomplish the purposes of the Plan. The responsibility and authority of the committee shall include but shall not be limited to the following: ·

\* \* \* \* \* \*

(5) Interpretation of the provisions of the Plan and publication of such rules for the regulation of the Plan as are deemed necessary and are not inconsistent with the terms hereof.

*Id.* at 8–9.

Finally, with regard to the plaintiff's claim that there exists an inherent conflict of interest, the following provisions are relevant:

The Committee shall be appointed by the board of directors of the Company. Each member of the Committee shall be an active officer of the Company.... All members of the Committee shall serve at the pleasure of the board of directors and may be removed from the Committee at any time with or without cause.

*Id.* at 7.

The Plan is self-insured, and benefits are payable solely from the assets of the Company.

*Id.* at 9.

The Committee shall discharge its duties with respect to the Plan solely in

the interest of the participants and (1) for the exclusive purpose of providing benefits to the participants and deferring reasonable expenses of the Plan; (2) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aim; and (3) in accordance with the Plan's provisions. *Id.* at 9–10.

## Discussion

The plaintiff has moved for summary judgment on his claim that the Committee wrongfully denied him disability benefits under the Plan. He argues that recent Supreme Court precedent dictates a de novo review by the court of the Committee's decision and that, in light of the evidence presented, the court should find that he was disabled as a matter of law. The plaintiff contends that de novo review is proper either by virtue of the limited discretion granted the Committee under the Plan or by reason of the Committee's inherent conflict of interest in balancing the claims of the Plan participants against the Company's economic interests. In the alternative, the plaintiff argues that the evidence so clearly establishes his disability that the Committee abused its discretion under an arbitrary and capricious standard.

The defendant counters with a cross-motion for summary judgment. Although its argument proceeds on the initial premise that an arbitrary and capricious standard applies in this case, the defendant contends that, as a matter of law, the plaintiff has not established that the Committee was in error under any standard of review. The defendant also makes a short, passing argument that the plaintiff's claims are barred by the applicable statute of limitations, and ultimately asks the court to award a reasonable attorneys' fee as provided by statute.

### A. Statute of Limitations

The defendant maintains that the applicable statute of limitations in this case is RCW 4.16.040, which calls for a time limit of 6 years in actions involving a written contract. The defendant cites *Nolan v. Aetna Life Ins. Co*, 588 F.Supp. 1375 (S.D. Mich.1984), for the proposition that the statute of limitations under ERISA for a disability claim is the analogous state statute of limitations for breach of contract. Seafirst argues that, because the plaintiff retired in 1982 and did not bring the present action until 1989, the time has run and the claims are barred.

The plaintiff's claim is brought under 29 U.S.C. § 1132 as a suit by a plan participant to recover benefits under the terms of the plan. In a separate section of ERISA, one finds a provision entitled "Limitation of actions":

No action may be commenced under this title with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation. *Id.* § 1113. In *Nolan*, cited by the defendant, the court held that § 1113 did not apply to actions under § 1132, because the latter section was not within the "part" referenced in § 1113. *Nolan*, 588 F.Supp. at 1378. Thus, the court turned to the most analogous state statute.

The state of the law in the Ninth Circuit is not entirely clear. In *Pierce County Hotel Employees and Restaurant Employees Health Trust v. Elks Lodge, B.P. O.E., No 1450*, 827 F.2d 1324 (9th Cir.1987), the court held that "29 U.S.C. § 1132, does not contain a statute of limitations. We therefore must choose the limitations peri-

od from a statute governing analogous claims." *Id.* at 1328. The court went on to hold that, in a trusts' collection action under ERISA against an employer, RCW 4.16.040 is applicable. *Id.*

In a more recent case, however, in which a plan participant challenged the denial of certain benefits under § 1132, the court simply cited § 1113 and assumed that it was the applicable statute of limitations. *See Meagher v. IAM Pension Plan,* 856 F.2d 1418, 1422 (9th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1943, 104 L.Ed.2d 414 (1989). The court was entirely silent on the issue whether the statute should apply.

█ In the present case, the court need not decide which statute applies because the plaintiff's complaint is timely in either instance. The solution lies in determining the point at which the limitations period began to run. The defendant obviously contends that the clock started on the day the plaintiff retired. The court disagrees.

"A cause of action accrues, and the statute of limitations begins to run, when a plaintiff knows or has reason to know of the injury that is the basis of the action." *Pierce County,* 827 F.2d at 1328. In making this determination, the court must isolate and define the underlying violation upon which the claim is based. *Meagher,* 856 F.2d at 1422.

In this case, the violation occurred, if at all, on April 17, 1989, when the Committee denied the plaintiff's application for disability benefits under the Plan. Only at that point did the plaintiff know that he might have been harmed and that he would have to seek judicial review. The plaintiff filed his complaint on July 21, 1989, some 3 months after his claim was rejected by the Committee. Based on the analysis above, the defendant's argument is without merit. The court finds that the plaintiff's complaint was filed timely even under the most restrictive limitations period available.

B.  Standard of Review

█ Last year, in *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court settled a long-standing conflict among the federal circuits as to the appropriate standard of judicial review of decisions made by plan fiduciaries. The Court stated:

> Consistent with established principles of trust law, we hold that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.

*Id.* 109 S.Ct. at 954. Thus, in the present case, the court must review the Committee's decision in de novo fashion unless the requisite discretionary authority is apparent from the provisions of the Plan. *See International Bhd. of Elec. Workers, Local 47 v. Southern Cal. Edison Co.,* 880 F.2d 104, 108 (9th Cir.1989); *Johnson v. Trustees of Western Conf. of Teamsters Pension Trust Fund,* 879 F.2d 651, 654 (9th Cir.1989). Because *Firestone* is a bellwether case that substantially altered the state of the law under ERISA, the court will use and cite only cases decided after *Firestone* in applying the above test to divine the appropriate standard of review in this case.

"There are obviously no magic words required to trigger the application of one or another standard of judicial review." *De Nobel v. Vitro Corp.,* 885 F.2d 1180, 1187 (4th Cir.1989). To invoke the *Firestone* exception to de novo review, it need only appear on the face of the plan documents that the administrator is given the power to interpret the provisions of the plan *or* to resolve disputes over benefit eligibility. *Id.* Thus, in a case in which the plan document stated that the administrator had the authority to "determine all questions of interpretation, policy or administration ... of the plans of [participating] employers," the court applied the arbitrary and capricious standard. *See St. Mary Med. Center v. Cristiano,* 724 F.Supp. 732, 741 (C.D.Cal. 1989); *see also De Nobel,* 885 F.2d at 1186 (committee possessed power to "determine all benefits and resolve all questions pertaining to the administration, interpretation

and application of Plan provisions"); *Bali v. Blue Cross and Blue Shield Ass'n*, 873 F.2d 1043, 1047 (7th Cir.1989) (discretionary authority found where term "disabled" defined as a determination "on the basis of medical evidence satisfactory to the Committee"); *Jett v. Blue Cross and Blue Shield of Ala.*, 890 F.2d 1137, 1139 (11th Cir.1989) (plan administrator granted "exclusive right to interpret the provisions of the Plan, so its decision is conclusive and binding"). The Ninth Circuit, however, has declined to preclude de novo review based on a plan provision that contained the following language: "charges deemed unreasonable by the [administrator]." *See Southern Cal. Edison*, 880 F.2d at 108.

In this case, we are faced with plan provisions that seemingly satisfy both prongs of the *Firestone* exception. The Committee, in its sole discretion, is to determine the existence of a disability and the amount of evidence required to establish a claim. *See* Ct. Rec. 22, Exhibit O, at 3. Furthermore, the Committee has the responsibility and authority to interpret the provisions of the Plan. *See id.* at 8–9. Thus, the discretion granted the Committee appears to be relatively complete.

At oral argument, counsel for the plaintiff argued that the needed discretion was lacking because the plan does not expressly provide that the decision of the Committee will be binding—an element counsel claims was dispositive for the court in *Exbom v. Central States, Southeast and Southwest Areas Health and Welfare Fund*, 900 F.2d 1138 (7th Cir.1990). Whether or not the Plan uses the word "binding," however, is unimportant because, as stated above, the determination of the proper standard of review is not one of semantics. Obviously, a decision made by one authorized to do so *in his sole discretion* must be considered binding on all those affected thereby. To hold otherwise would necessitate a total disregard for the clear import and meaning of the term "sole discretion." Thus, the argument does not carry the day. Indeed, given that it is the discretion of the fiduciary upon which the standard of review determination is made, under a semantics argument the use of the word "discretion"

at least twice at critical points in the Plan would cut in favor of the defendant. Thus, to this point the court can find no basis for dispensing with the abuse of discretion standard in favor of de novo review.

The plaintiff argues that the plan in question has such a built-in bias or conflict of interest that a more stringent standard of review is required than that of arbitrary and capricious. Although the court does not necessarily agree with the plaintiff's characterization of the relevant law, if a conflict does exist the court must take that fact into account in applying the arbitrary and capricious standard. In *Firestone*, the Court stated:

> "Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'factor[ ] in determining whether there is an abuse of discretion.'"

*Firestone*, 109 S.Ct. at 956 (quoting *Restatement (Second) of Trusts* § 187, comment d (1959)).

The defendant argues that there is no conflict of interest because the plan directs the Committee to "discharge its duties solely in the interests of the Participants." *See* Ct. Rec. 22, Exhibit O, at 9. Thus, despite the fact that the members of the Committee are active officers of the Company, serve at the pleasure of the board of directors, and administer a self-insured plan in which benefits are paid out of the assets of the Company, the defendant maintains that the court should not consider the likelihood of bias. In support of this proposition, the defendant quotes the following language from the Fourth Circuit's opinion in *De Nobel:*

> In [these] circumstances, we obviously cannot attribute "presumptive bias" to the administrators—notwithstanding that they serve dual roles as company employees and pension plan fiduciaries....
>
> ... Adverse benefits determinations may well have saved considerable sums, but that may simply reflect that the trustees, bearing in mind the interests of

*all* participants and beneficiaries ... made a considered decision to preserve the corpus of the trust, rather than grant a doubtful claim.

*De Nobel,* 885 F.2d at 1191.

What the defendant conveniently fails to quote for the court is the portion of the opinion *immediately preceding* the above language in which the Fourth Circuit defined what it meant by "these circumstances." Before stating its holding, the court explained in vivid detail that the benefits trust in that case was fully funded and that, although the defendant made contributions to the fund, any benefits decision had an immediate impact only on the fund itself; thus, the defendant incurred no direct, immediate expense by reason of a determination favorable to a plan participant. *Id.*

The present case offers a far different factual scenario. The defendant's Plan is self-insured and benefits are paid directly out of the assets of the Company. The impact of the Committee's decisions on the Company, therefore, is both immediate and direct. Such an arrangement must cause this court considerable pause as it reviews the impartiality of a decision made by Committee members who, as required by the Plan, are active officers of the Company and can be removed by the Company without any cause whatsoever.

Of additional concern to the court in this regard are the admissions of defense counsel that he provides legal advice to the Committee, and even reduced to written form the Committee's denial of benefits to the plaintiff, despite the fact that his fees are paid by the defendant bank. Counsel, of course, points out that any attorney hired by the Committee must look to the Company for payment of legal fees. The court, however, only considers this to be further evidence of the inherent conflict of interest that exists under the Plan.

The court also is not persuaded by the defendant's argument that the Plan somehow extinguishes any element of bias by mandating that the Committee act solely in the interests of the participants. The effect of such a provision, in light of the realities of the Committee's role in the Plan, is to conjure up images of the proverbial fox who, while standing guard at the hen house door, proclaims his unending and undivided loyalty to the profit-minded farmer. This court cannot blindly subscribe to the fiction that the Committee members, given the clear temptations built into the Plan to do otherwise, will always and at all times act only in the interests of a claimant simply because the Plan says that they will. Common sense suggests a contrary, more practical conclusion.

In short, after considering all the factors above, the court finds that a conflict of interest does exist in this case and that it must be taken into account in conducting the necessary review. *See Davis v. Kentucky Fin. Cos. Retirement Plan,* 887 F.2d 689, 694 (6th Cir.1989) ("The fact that the Retirement Committee that administers the plan is composed of management-level employees of KFC is significant only to the extent that any possible conflict of interest should be taken into account as a factor in determining whether the Committee's decision was arbitrary and capricious."), *cert. denied,* —— U.S. ——, 110 S.Ct. 1924, 109 L.Ed.2d 288 (1990). The difficulty at this point, however, is deciding what role the element of bias must play in the court's review.

In a very recent case from the Eleventh Circuit, the court had before it a benefits plan that, in terms of structure and the potential for bias, was substantially similar to the defendant's Plan. *See Brown v. Blue Cross and Blue Shield of Alabama, Inc.,* 898 F.2d 1556 (11th Cir.1990). In *Brown,* an employee sued under ERISA to recover hospitalization benefits that were denied by the defendant who was acting as the fiduciary under a group health plan. The contract between the employer and Blue Cross, an insurance company, conferred discretion on Blue Cross as to the matter of benefits determinations. Thus, the arbitrary and capricious standard was applicable. *Id.* The court went on to note, however, that the defendant's fiduciary role was in perpetual conflict with its profit-making role as a business because an

insurance company pays beneficiaries from its own assets rather than the assets of a trust. *Id.* Thus, the "inherent conflict between the fiduciary role and the profit-making objective of an insurance company makes a highly deferential standard of review inappropriate." *Id.*

With that said, however, the *Brown* court refused to conduct a de novo review of the defendant's decision and steadfastly maintained that it would apply an arbitrary and capricious standard, but with a slight twist. The court stated:

> We therefore hold that the abuse of discretion, or arbitrary and capricious, standard applies to cases such as this one, but the application of the standard is shaped by the circumstances of the inherent conflict of interest.

*Id.* Thus, "the area of discretion to which deference is paid must be confined narrowly to decisions for which a conflicted fiduciary can demonstrate that it is operating exclusively in the interests of the plan participants and beneficiaries." *Id.*

The court finds the reasoning in *Brown* to be persuasive and that a similar standard should apply in the present case. Although arguments could be made that the conflict of interest in *Brown* was more egregious than that facing the court here, the court is unable to find any meaningful distinction between the two plans. In each case there exists a direct conflict between the interests of the participants and the interests of the business. Thus, the analysis in *Brown* applies; the court will review the Committee's decision for an abuse of discretion, but take particular note of the obvious potential for bias that is present and afford the decision little, if any, deference.

### C. Analysis

■ The plaintiff undoubtedly has the laboring oar in a case such as this. The burden is on him to prove that the ruling was arbitrary and capricious. *Cristiano,* 724 F.Supp. at 742.

■ Under a pure arbitrary and capricious standard, the "trustees abuse their discretion if they render decisions without any explanation, or construe provisions of the plan in a way that clearly conflicts with the plain language of the plan." *Johnson,* 879 F.2d at 654. But the trustee's decision "will not be disturbed if reasonable." *Firestone,* 109 S.Ct. at 954. As set forth above, however, the conflict that presents itself in this case demands that the court employ a higher level of scrutiny in searching for an abuse of discretion. Thus, before granting a motion for summary judgment in this case, the court must be satisfied that there exists no genuine issue of material fact surrounding two crucial inquiries: (1) whether, under traditional "abuse of discretion" analysis, the Committee's decision denying benefits was arbitrary and capricious, *Davis,* 887 F.2d at 694, and (2) whether the Committee's conflict has tainted its judgment, *Brown,* 898 F.2d at 1556. Summary judgment is proper only if both elements are resolved in a manner favorable to the defendants. Of course, in making this determination, the court must bear in mind that the plaintiff has the ultimate burden of persuasion with regard to the first element, while the defendant shoulders the burden on the second.

The defendant asserts that the Committee carefully reviewed all the medical data submitted by the plaintiff, consulted its own medical experts, and arrived at a rational conclusion that was fully explained to Mr. Poole in a written decision. Moreover, the defendant notes that all of the examining physicians agree that, at the time of his retirement, the plaintiff had sufficient vision capability to perform the duties of his occupation, at least during those times when the symptoms were not active. The defendant argues further that there was no evidence to support the plaintiff's contention that his vision would continue to deteriorate if he continued his employment with the Bank.

The plaintiff, on the other hand, counters that the decision was arbitrary in that it required "concrete scientific evidence" that continued deterioration of his vision was inevitable due to job-related stress. The plaintiff maintains that, in light of the un-

certain state of medical technology with respect to this particular condition, such a standard is impossible to meet. The remainder of the plaintiff's brief largely amounts to arguments aimed at bolstering the opinion of Dr. Thorn, the plaintiff's treating physician, and seeking to discredit the opinions of the other medical experts. He apparently contends that the Committee arbitrarily and capriciously weighed the evidence before it.

█ The court has trouble with several of the plaintiff's contentions, not the least of which is the manner in which he frames the issue. Under this court's reading of the Plan provisions, the issue is simply whether, at the time of his retirement, the plaintiff's vision was adequate to perform the duties of his occupation. Thus, the issue of job-related stress, and whether the plaintiff's vision would have deteriorated to the point of "disability," is irrelevant. He was either disabled or he was not.

The plaintiff would have this court interpret the term "disability" to include those illnesses that can *cause* a person to become disabled if he continues in his employment. This the court cannot do. Not only does the Plan confer authority on the Committee to interpret its provisions, thus suggesting to the court that a certain amount of deference is in order, but the Committee's interpretation in this instance appears to be wholly rational and reasonable. The term "disability" is defined as the *"complete inability"* to perform the essential duties of the occupation. Even under a loose reading of the term "complete," an employee who is able to perform the essential duties of his job for all but 10 or 15 weeks out of the year could not be considered disabled under the Plan. Thus, it appears that it is the plaintiff's reading of the relevant Plan provision that is accomplished only by stretching the meaning of the express language. At the very least, the Committee's interpretation of this language as precluding benefits to one who *may become* completely unable to perform in the future cannot be deemed unreasonable.

With the issue properly framed, the court now turns to the task of deciding whether there exists a genuine issue of material fact as to whether the Committee's determination—that at the time of his retirement the plaintiff was not disabled—was arbitrary and capricious or was tainted by the conflict found to exist in this case. Unfortunately, while the court feels strongly that Mr. Poole was not treated with adequate consideration by an employer to which he was loyal for over 40 years, the court finds that the Committee's decision should not be disturbed as a matter of law.

The overwhelming evidence, perhaps all the evidence, before the Committee suggested that, at least during those periods when the symptoms were not active, the plaintiff was not disabled as that term is defined in the Plan. Even the plaintiff's treating physician, Dr. Thorn, who continues to be a most ardent proponent for a finding of disability, stated that Mr. Poole was only unable to perform his duties during those periods when the disease was active. The other medical experts, while appearing to concur in this assessment, opined that the plaintiff cannot be considered to have been disabled.

The plaintiff argues that the Committee acted arbitrarily in considering the statements made by the plaintiff's superiors who encouraged him to retire early. He appears to suggest that a proper appreciation for these statements indicates that those supervisors were of the opinion that Mr. Poole was incapable of performing his employment duties at the time he retired. The court notes, however, that Mr. Robert Hague, the plaintiff's immediate supervisor, candidly stated that the plaintiff's work performance was not a factor in his decision to encourage early retirement. He states:

> This had nothing to do with his work because George was at least an average manager, although somewhat paternalistic in his handling of his people and his customers. As a loan supervisor, I knew his loss ratio was well below the average and that I did not worry much about the conditions of the credits in his branch

because George looked after them quite well.

Ct. Rec. 22, Exhibit M. Thus, the Committee's impression that the supervisors simply were motivated by their concern for the plaintiff's health cannot be deemed unreasonable. To the contrary, the supervisors offered their opinions that the plaintiff could perform his duties in an adequate fashion.

From the above record, the court is unable to conclude, even under the heightened "bias" standard of review, that the Committee's decision was arbitrary and capricious. The Committee's interpretation of the Plan provisions and its weighing of all the available evidence appears to be reasonable, and the plaintiff was provided with a written explanation of the Committee's decision. Furthermore, the court is satisfied that the known conflict of interest was not a discernable factor in this case. As stated above, the Committee's interpretation of the term "disability" appears to be correct, or at least reasonably correct, and its decision does not appear to favor the Company at the expense of the interests of the Plan beneficiaries as a whole. Indeed, were this court to engage in a de novo review of the decision to deny benefits to the plaintiff, there is a substantial likelihood that the court would reach the same conclusion as the Committee. Accordingly, finding that there exists no issues of material fact and that the defendant is entitled to judgment as a matter of law, the defendant's Cross–Motion for Summary Judgment is HEREBY GRANTED; the plaintiff's Motion for Summary Judgment must be, and is, DENIED.

## D. Attorneys' Fees

■ In light of the court's ruling, it becomes necessary to address the defendant's motion for an award of costs and attorney's fees pursuant to 29 U.S.C. § 1132(g). That section states that "[i]n any action under this title ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." *Id.*

The Ninth Circuit has developed guidelines to be used by trial courts in exercising their discretion under the statute:

"They should consider these factors among others: (1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy an award of fees; (3) whether an award of fees against the opposing parties would deter others from acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions."

*Hope v. International Brotherhood of Electrical Workers, Ninth District,* 785 F.2d 826, 831 (9th Cir.1986) (quoting *Hummell v. S.E. Rykoff & Co.,* 634 F.2d 446, 453 (9th Cir.1980)).

In light of the above factors, the court finds that an award of fees clearly is not warranted here. There is absolutely no evidence that the plaintiff brought this action in bad faith. It appears from the record that the plaintiff is not presently in an entirely healthy economic state and that an award of fees would amount to a serious hardship. Moreover, the plaintiff's claims fall far short of being labeled unmeritorious, as he has set forth several arguments of substantial merit that have caused this court to expend much time and study in arriving at its decision. Finally, individuals finding themselves in the plaintiff's position should be encouraged to seek judicial review to police decisions made by plan fiduciaries, especially where, as here, a conflict of interest is found to exist. An award of fees in this instance could very well have a chilling effect on future claimants. Accordingly, the defendant's motion for fees is HEREBY DENIED.

IT IS HEREBY ORDERED:

1. The plaintiff's Motion for Summary Judgment (Ct. Rec. 9) is HEREBY DENIED.

2. The defendant's Cross–Motion for Summary Judgment (Ct. Rec. 19) is HEREBY GRANTED. The complaint and all

claims therein shall be DISMISSED WITH PREJUDICE.

3. The defendant's Motion for Attorney's Fees (Ct. Rec. 19) is HEREBY DENIED.

4. The Clerk is directed to enter final judgment against the plaintiff George Poole and in favor of Seattle–First National Bank and Seafirst Corporation.

IT IS SO ORDERED.