4 F.3d 984
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Rodney E. AUSTIN, Plaintiff-Appellee,
v.
RJR NABISCO, INCORPORATED, Defendant-Appellant.
Rodney E. AUSTIN, Plaintiff-Appellant,
v.
RJR NABISCO, INCORPORATED, Defendant-Appellee.
 Nos. 92-2319, 92-2365.
 United States Court of Appeals,
Fourth Circuit.
 Argued: June 8, 1993.
Decided: September 3, 1993.
 
 Appeals from the United States District Court for the Middle District of North Carolina, at Winston-Salem. Frank W. Bullock, Jr., Chief District Judge. (CA-88-1169-WS)
 ARGUED: George Lester Little, Jr., Petree, Stockton, Winston-Salem, North Carolina, for Appellant.
 Reginald Farrell Combs, House & Blanco, P.A., Winston-Salem, North Carolina, for Appellee.
 ON BRIEF: William E. Wright, Petree, Stockton, Winston-Salem, North Carolina, for Appellant.
 David V. Liner, Winston-Salem, North Carolina, for Appellee.
 M.D.N.C.
 AFFIRMED.
 Before ERVIN, Chief Judge, MURNAGHAN, Circuit Judge, and BRITT, United States District Judge for the Eastern District of North Carolina, sitting by designation.
 PER CURIAM:
 
 OPINION
 
 1
 The present case arises under the civil enforcement provisions of the Employment Retirement Income Security Act (ERISA), 29 U.S.C. Sec. 1132. Rodney Austin, an inactive senior employee of RJR Nabisco (RJRN), brought suit in the United States District Court for the Middle District of North Carolina on December 8, 1988 to recover amounts he contended were due to him under an ERISA plan. Following discovery and other pre-trial proceedings, including summary disposition of some of Austin's claims and RJRN's counterclaim, the case was tried on May 4 and 5, 1992, before the district judge, sitting without a jury. On September 16, 1992, the district court entered its Memorandum Opinion and Judgment, reaching thirteen conclusions of law-some favorable to Austin, some to RJRN. RJRN's appeal and Austin's cross-appeal from the district court's decision are presently before us.
 
 
 2
 Austin was an active employee of RJRN and its predecessors, R.J. Reynolds Tobacco Company and R.J. Reynolds Industries, Inc. (known collectively as RJR), from 1953 until 1986. Austin held various personnel management positions throughout his tenure at RJR and RJRN and was elected Senior Vice President for Corporate Personnel in 1980. RJR merged with Nabisco in 1985.
 
 
 3
 In August 1986, the corporate management of RJRN changed. F. Ross Johnson, the then-President of RJRN, was elected Chief Executive Officer, effective January 1, 1987, replacing Tylee Wilson, the longtime CEO of RJRN. After Johnson was elected, he replaced many senior executives over a two to three week period with members of his own management team.
 
 
 4
 On a Friday afternoon in early September 1986, Johnson informed Austin that a constituency on the RJRN Board of Directors wanted Austin to retire. Johnson indicated he wanted to treat Austin fairly and asked him to propose terms of a severance agreement. Austin requested time over the weekend to think about terms he wanted to include in a severance agreement.
 
 
 5
 On the following Monday morning, September 9, 1986, Austin gave Johnson a handwritten list of five broad categories of benefits to be included in the severance agreement: (1) payment of his 1986 Management Incentive Program Award (MIP) at target and a $20,000 salary increase; (2) severance pay for 1987 and 1988, payment of MIP at target for each year, regular stock options at his grade level (28) for 1987 and 1988, stock appreciation rights, and a clause assuring pay and stock options in the event Austin died; (3) receipt of a Performance Incentive Plan (PIP) grant at his grade level in 1987 and 1988, with all stock options and MIP and PIP grants vested at target on death or retirement; (4) five years additional service credit toward retirement; and (5) immediate vesting of 20,000 shares of restricted stock already held by Austin and a grant of 20,000 additional shares of restricted stock to vest upon death or retirement.
 
 
 6
 Johnson read Austin's proposal and agreed to support it before the Organization and Compensation Committee of the Board of Directors, which was responsible for reviewing and approving executive pay practices and individual pay arrangements. The Committee approved the terms of the severance agreement which had been proposed by Austin and supported by Johnson. Subsequently, Colin McBride, a member of RJRN's legal department who worked on employee benefits issues, was assigned the responsibility of drawing up a formal severance agreement between RJRN and Austin. During a meeting with Austin to discuss the severance agreement, McBride reviewed a copy of Austin's handwritten proposal and took notes.
 
 
 7
 McBride prepared at least eight drafts of the agreement. Austin reviewed the eighth draft on September 29, 1986. In a telephone conversation with McBride on that date, Austin raised questions about the absence of provisions for successor executive incentive plans, the disposition of the terms of the agreement in the event of his death, and the award to him of stock options comparable to the options received by other executives during the term of the severance agreement. With regard to successor plans, McBride asked if Austin was concerned about stock options. Austin said that he was. McBride told Austin he did not think any successor plan language was necessary, but that he would insert language about a death eventuality and stock options.
 
 
 8
 The final severance agreement was dated September 29, 1986, and was signed by Johnson and Albert Butler, Chairman of the Organization and Compensation Committee, on behalf of RJRN. Austin acknowledged the agreement by signing the letter incorporating it.
 
 
 9
 The agreement placed Austin on inactive pay status and provided (a) for his retirement on January 1, 1989, and (b) for an annual salary of $295,000 until that date. Provisions for survivor rights and retirement benefits were included as Austin had requested. Austin received 20,000 shares of restricted stock that would vest upon retirement or earlier death. All other bonus plan awards outstanding as of January 12, 1989, would vest on that date, as would the 20,000 shares of restricted stock Austin held before the severance agreement was made. The agreement required Austin to be supportive of the company and its management, to refuse employment elsewhere without RJRN's written consent, and to be available to RJRN in a consulting role.
 
 
 10
 The agreement also contained the following provisions:
 
 
 11
 1. Inactive Pay Status/Benefits. You will ... (ii) receive awards under both the RJRN Management Incentive Plan ("MIP") and RJRN Performance Incentive Plan ("PIP") for 1986, 1987 and 1988 at the targets established for your present employee grade level; and (iii) be entitled in 1986, 1987 and 1988 to all employee benefits extended to active employees. If during 1987 and 1988, the Company grants stock options, or comparable awards in lieu thereof, to its senior executive officers, you will be granted stock options, or if applicable, comparable awards in the target amounts established for your present employee grade level.
 
 
 
 *
 
 *
 *
 
 
 
 12
 4. 1986, 1987 and 1988 MIP and PIP Awards. Your 1986, 1987 and 1988 MIP and PIP awards shall be paid to you at 100% of the target amount without adjustment for performance.
 
 
 13
 RJRN's Management Incentive and Performance Incentive Plans (MIP and PIP, respectively) were part of its Long-Term Incentive Plan (LTIP) for key executive employees. MIP was an annual cash bonus plan for executives. Each year, an executive conferred with his or her supervisor and established performance goals. If the executive met the goals, he or she received a target bonus at the midpoint of his or her salary range. The MIP award could be adjusted upward or downward from the target if the executive exceeded or failed to meet the goals. In 1987, the MIP target was changed and Austin was paid a MIP award based on the new target.
 
 
 14
 PIP was a long-term incentive cash bonus plan which had a three-year life cycle. In the first year of the cycle, each executive was granted a target award amount. The target was a fixed percentage which was applied to the midpoint of an executive's individual salary range to arrive at a target award. At the end of the third year of the cycle, a cash award was made based on corporate performance, as measured by increases in earnings per share, during the three-year period. The actual cash award could range from zero to 150 percent of the target set in the first year depending on the change in earnings per share. A new three-year cycle began each year; thus, an executive could receive PIP awards annually because a cycle was completed each year. In 1986, Austin was granted a PIP target award of $125,000 for the 1986-1988 cycle, which was equivalent to fifty-five percent of the midpoint of his salary range.
 
 
 15
 In 1987, the Performance Share Plan (PSP) replaced PIP and reflected RJRN's decision to move away from compensating executives with stock option grants. Like PIP, PSP was based on a three-year cycle and grants were derived by establishing a target award cash value. The value was a percentage of the executive's salary at the beginning of the three-year cycle. The cash value was then divided by the current price per share of RJRN common stock to arrive at a grant in terms of performance shares. One performance share was equivalent to one share of RJRN common stock. Like PIP, the PSP payment value was determined by earnings per share growth. In 1987, Austin was granted 3,278 performance shares for the 1987-89 cycle with an initial grant value of $49.50 per share and a grant value of $162,250 if the target growth rate was met.
 
 
 16
 Also in 1987, RJRN made a grant of restricted stock to key executive employees. The restricted stock grant had been ratified by RJRN's Organization and Compensation Committee at a meeting on November 19, 1986. The Agenda Discussion Material for that meeting, which had been reviewed and approved by the Committee, recommended that special restricted stock awards be made in consideration for the restructuring of the long-term management plans. That restructuring included the discontinuation of stock option grants as part of RJRN's revision of executive compensation programs.
 
 
 17
 In 1988, RJRN discontinued PIP and PSP and instituted a Restricted Stock Plan (RSP). RSP operated like PSP in many respects, but granted restricted stock at the end of the performance cycle rather than the cash value of performance shares. The target award under RSP for Grade 28 employees (Austin's grade level) was sixty-nine percent of the salary range midpoint of $300,000 divided by the New York Stock Exchange (NYSE) trading price of RJRN shares ($45.68), or 4,532 shares of restricted stock. Although RJRN notified its active employees of the change to RSP in March 1988, it did not inform Austin.
 
 
 18
 As part of its adoption of RSP in 1988, RJRN converted then-pending PIP and PSP awards to RSP. Both conversions used a factor of 144 percent of target, which represented the average percentage of target actually paid at the end of the 1984-86 and 1985-87 performance cycles. PIP awards were converted by multiplying the target award, a cash figure, by 144 percent and dividing by $45.68 to obtain the number of restricted shares to be delivered in January 1989. PSP awards were converted by multiplying the target number of performance shares awarded by 144 percent. The resulting number of shares of restricted stock were to be delivered in January 1990.
 
 
 19
 Austin's PIP and PSP grants were not converted to RSP, nor was a RSP target grant made to him in 1988. After Austin made numerous inquiries in March and April 1988 about the conversion to RSP, Austin received a letter dated May 13, 1988, from Andrew Barrett, RJRN's Senior Vice President for Personnel, offering a specific interpretation of the severance agreement. Barrett referred to the LTIP rather than Austin's severance agreement in explaining that Austin's awards could not be converted to RSP because he was within one year of retirement. The LTIP contained a provision that"no incentive award under the Plan may be granted to a Participant within 12 months of his or her normal retirement date." The LTIP also provided that "a Participant whose Severance Date is within 12 months of the date of any award granted to him or her under this Plan ... shall have no right to receive any benefit or payment for such award after such Participant's Severance Date."
 
 
 20
 Barrett informed Austin that his 1986-88 award would be $125,000 cash, the target award; that his 1987-89 PSP award would be the target award of 3,278 shares multiplied by the average NYSE market price of RJRN common stock during the last forty-five days of the three-year performance cycle; and that in lieu of an RSP award for the 1988-90 cycle, RJRN would pay Austin $162,250, which represented fifty-five percent of Austin's $295,000 salary and was the former PSP target. If Austin's PIP and PSP grants had been converted to RSP, his 1986-88 PIP target would have been $180,000 and his 1987-89 PSP target would have been 4,720 shares of restricted stock.
 
 
 21
 From the date of Austin's severance until the initiation of the present action, RJRN had been remunerating Austin according to its interpretation of their severance agreement. From September 29, 1986 to January 1, 1989, RJRN paid Austin a salary of $295,000 per year. RJRN paid Austin MIP awards of $125,000 for 1986 and $142,500 for 1987.
 
 
 22
 In December 1988, after the takeover of RJRN by Kohlberg Kravis Roberts & Co., RJRN made early payments from its executive compensation accounts to its inactive employees. RJRN advised Austin by letters dated December 6 and 9, 1988, that he would receive $125,000 in payment of the 1986-88 PIP award, $142,500 in payment of the 1988 MIP award, and $254,545.88 in payment of the 1987-89 PSP award, less applicable taxes. The payments calculated by RJRN were consistent with the May 1988 letter from Barrett indicating that RJRN would not include Austin in the conversion to RSP.
 
 
 23
 On December 8, 1988, Austin filed the present action against RJRN pursuant to ERISA in order to recover payments allegedly due to him under the severance agreement. Prior to Austin filing suit, RJRN cut three checks on December 1, 1988, representing the PIP, MIP, and PSP payments. However, James Crittenden, then Deputy General Counsel of RJRN, decided to withhold those payments and to file a counterclaim against Austin for breach of the duty to be supportive of RJRN imposed upon him by the severance agreement.
 
 
 24
 Counts I and III of Austin's complaint, as amended, survived the preliminary stages of litigation. RJRN's counterclaim was dismissed. In Count I, Austin sought to recover and enforce his rights under the severance agreement and to clarify his rights to future benefits pursuant to 29 U.S.C. Sec. 1132(a)(1)(B). Count I also alleged that RJRN discriminated against Austin by treating his rights to convert previous LTIP grants and his 1988 restricted stock grant differently from those of other grantees, in violation of 29 U.S.C. Sec. 1140. Count III alleged that RJRN interfered with Austin's protected rights under ERISA by its failure timely to deliver a share certificate representing the 20,000 shares of restricted stock granted to him in September 1986.
 
 
 25
 On May 4 and 5, 1992, the district court held a bench trial on the two remaining claims. On September 16, the district court issued its opinion, in which it initially reiterated an earlier court order determining that the severance agreement between Austin and RJRN was an "employee benefit plan" within the meaning of ERISA, 29 U.S.C. Sec. 1002(3). Neither party currently disputes that issue. The court then determined that RJRN's denial of benefits was subject to plenary review.
 
 
 26
 As to the merits of Austin's Sec. 1132 claim (part of Count I of the complaint), the district court made several determinations, only three of which are challenged on appeal. RJRN contests, in two aspects, the district court's ruling on the effects of the evolution of its incentive program for management employees (PIP to PSP to RSP) on its severance agreement with Austin. Specifically, RJRN has argued that the district court clearly erred in holding that the restricted stock granted to key executive employees in 1987 was part of RJRN's plan to discontinue stock options in 1987; and that thus, the 1987 restricted stock awards were "in lieu of stock options" within the meaning of the severance agreement. As a result, RJRN has disputed the district court's holding that, under the agreement, Austin was entitled to a 1987 restricted stock award for his grade level. The district court calculated that a grade 28 employee in RJRN would receive 22,500 shares.
 
 
 27
 RJRN has also challenged the district court's finding that the 144% factor used to convert PIP and PSP awards to RSP for active employees was not an adjustment for company performance within the meaning of the severance agreement; rather, it was an early payout of benefits under PIP and PSP. RJRN has disputed the district court's conclusion that, therefore, Austin was entitled to the conversion of his PIP and PSP targets to RSP.
 
 
 28
 Although the district court concluded that Austin's PIP and PSP should be converted to RSP by multiplying the target award of each by 144%, it refused to divide the enhanced cash award (i.e., the converted target) by the share price of RJRN stock to determine the number of shares of restricted stock due to Austin. The district court reasoned that such a calculation was unnecessary because the severance agreement provides that awards are to be paid at target. In his cross-appeal, Austin has challenged the district court's conclusion in that regard.
 
 
 29
 As a threshold issue, we must determine whether the district court correctly concluded, in light of Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), that it should review de novo RJRN's interpretation of its severance agreement with Austin. In Bruch, the Supreme Court held that:
 
 
 30
 a denial of benefits challenged under Sec. 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.
 
 
 31
 489 U.S. at 115.
 
 
 32
 Shortly after the Bruch decision, we had cause to elaborate on the revised standard of review for ERISA plans. De Nobel v. Vitro Corp., 885 F.2d 1180, 1186 (4th Cir. 1989). Writing for a unanimous panel in De Nobel, Judge Phillips explained that
 
 
 33
 [t]here are obviously no magic words required to trigger the application of one or another standard of judicial review. In this setting, it instead need only appear on the face of the plan documents that the fiduciary has been "given[the] power to construe disputed or doubtful terms"-or to resolve disputes over benefits eligibility-in which case "the trustee's interpretation will not be disturbed if reasonable."
 
 
 34
 De Nobel, 885 F.2d at 1187 (quoting Bruch, 489 U.S. at 115).
 
 
 35
 RJRN has contended that the severance agreement impliedly incorporated the terms and conditions of all of its existing compensation plans, including a provision giving the plan administrators sole and exclusive discretion to interpret those plans. RJRN therefore has argued that its determination as to Austin's eligibility to participate in successor LTIP's and to receive restricted stock should be reviewed under a deferential abuse of discretion standard.
 
 
 36
 In support of its argument, RJRN has relied entirely on the following language in its severance agreement with Austin:
 
 
 37
 2. Restricted Stock Grant/Vesting... The exercise, payment or delivery of all such awards or shares, as the case may be, shall be in accordance with the terms of the applicable Company plans.
 
 
 38
 However, by its own terms, this provision of the agreement incorporates by reference only those provisions of the various Company plans concerning the exercise, payment or delivery of awards or shares. It is mechanical in nature and "on its face" does not incorporate the interpretive discretion provisions of the various Company plans.
 
 
 39
 Moreover, if RJRN wished to retain interpretive authority, it needed to do so explicitly in the severance agreement. Colin McBride, RJRN's in-house attorney specializing in executive compensation issues, participated in drafting the company's executive compensation plans and prepared eight drafts of Austin's severance agreement. McBride also wrote the provision in paragraph 2 of the severance agreement. If he had intended to incorporate the terms of the other plans, we would expect him to do so explicitly, particularly in light of his legal training and extensive experience with RJRN's executive compensation program. See Reinking v. Philadelphia American Life Ins. Co., 910 F.2d 1210, 1214 (4th Cir. 1990) (holding that while an employer and its employees may agree upon a narrower standard of review, such an agreement will not be read into an employee benefit plan because to do so would undermine protection afforded employees by ERISA).
 
 
 40
 In Reinking, the defendant insurance company argued that even in the absence of express authority, it had implicit authority to determine matters necessary for the efficient administration of the policy at issue. We disagreed, finding that the insurance company had only limited authority:
 
 
 41
 If anything, the grant of specific limited authority without mention of a general power to interpret policy terms suggests an intention not to delegate such responsibility. Accordingly, we affirm the district court's decision to apply a de novo standard of review.
 
 
 42
 Reinking, 910 F.2d at 1214.
 
 
 43
 Because there is nothing in the severance agreement indicating that the parties agreed to grant RJRN discretionary authority to interpret eligibility, the district court correctly reviewed RJRN's interpretation de novo.[1]
 
 
 44
 We review the district court's findings for clear error. See Fed. R. Civ. P. 52(a); see also United States v. Cox, 964 F.2d 1431 (4th Cir. 1992). A finding is "clearly erroneous" when"the reviewing court on the entire evidence is left with the definite and firm conclusion that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364 (1948). The Fourth Circuit has held that a reviewing court cannot reverse a determination by the district court which is "plausible in light of the record viewed in its entirety." Davis v. Food Lion, 792 F.2d 1274, 1277 (4th Cir. 1986). The district court's decision should be upheld even where it is only one of several permissible views of the evidence. Id.
 
 
 45
 The district court found that RJRN granted restricted stock to many senior executive officials in 1987 because of its plan to discontinue stock options in 1987. The court concluded that, consequently, the 1987 restricted stock award was a "comparable award in lieu of stock options" within the meaning of the severance agreement[2] and Austin was entitled to such an award at the target amount for his employee grade level. He determined that amount to be 22,500 shares.
 
 
 46
 RJRN has contended that the district court's decision is clearly erroneous in three aspects: (1) the 1987 special restricted stock grants were not "in lieu of stock options"; (2) awards of restricted stock were not "comparable" to awards of stock options; and (3) the number of shares awarded is without foundation. We find that the district court's holding is credible and plausible in light of the evidence on the entire record and thus is not clearly erroneous.
 
 
 47
 In reaching its conclusion, the district court relied upon the Agenda Discussion Material reviewed and approved by RJRN's Organization and Compensation Committee on November 19, 1986, which recommended that special restricted stock awards be made in consideration for the restructuring of the long-term management plans. Since that restructuring included the discontinuation of stock option grants, the district court reasonably concluded that the grant was made in place of stock options.
 
 
 48
 The materials also indicate that the proposed restricted stock grants for employees below level 25 "take account of the proposed discontinuance of stock options in 1987." RJRN, relying on this provision, has argued that the restricted stock grants can only be viewed as "in lieu of stock options" if the recipient was below level 25. However, the materials also support the conclusion that, as a general matter, RJRN's Organization and Compensation Committee believed that restricted stock awards generally would replace the award of stock options and that the two benefits were viewed as comparable. The agreement does not indicate that restricted stock would not be regarded as "in lieu of stock options" for more senior executives; in fact, beginning in 1987, restricted stock replaced stock options as incentive awards for all senior executive employees. The fact that restricted stock replaced stock options as an executive benefit supports the district court's conclusion that they are comparable within the meaning of the severance agreement. Their equivalence in the present case is also evidenced by the fact that the awards served the same purpose and were limited in the identical manner by RJRN.
 
 
 49
 Finally, we do not believe that the district court's determination of the proper number of shares was mistaken. Since there was no grade 28 employee among the relevant group of recipients of the 1987 restricted stock grant, the district court selected a number of shares midway between a grant to a grade 29 employee (25,000) and a grade 27 employee (20,000). It calculated the mean figure for a grade 28 employee as 22,500 shares. Such a calculation was reasonable and thus not clearly erroneous.
 
 
 50
 We next consider the district court's decision to adjust Austin's LTIP cash award for 1986, 1987, and 1988 using the same conversion factor (144%) used by RJRN to transform targets under PIP and PSP to RSP for active employees. Paragraph four of Austin's plan provides that his "1986, 1987 and 1988 MIP and PIP awards shall be paid to you at 100% of the target amount without adjustment for performance." As discussed previously, RJRN replaced PIP with PSP in 1987 and subsequently replaced PSP with RSP in 1988. When RJRN adopted RSP, it canceled entirely PSP and PIP and converted then-pending PIP and PSP awards[3] to RSP using a conversion factor of 144 percent. This factor was derived by averaging the payouts over the 1984-1986 and 1985-1987 award cycles. The payouts for those earlier cycles were based on corporate performance, hence RJRN has asserted that the conversion factor may not be applied to Austin's MIP and PIP awards because it is a performance-based adjustment within the meaning of the severance agreement.
 
 
 51
 The district court disagreed with RJRN's interpretation, reasoning that
 
 
 52
 [r]egardless of the measures or methodology used to obtain the conversion factor, the factor itself remains simply that-a multiplier to be used in transforming an award target under one plan to its equivalent under a comparable plan. It is distinguishable from the performance-based factor RJRN applied to the targets at the end of each award cycle to determine this amount of the awards: had RJRN intended to make performance-based awards under PIP and PSP as of 1988, it could have evaluated performance during the cycle as of the conversion date and applied that factor accordingly. Instead, RJRN developed the conversion factor from the percentages of target paid out during the 1984-86 and 1985-87 cycles. Austin is entitled to a conversion of his PIP and PSP awards to RSP at 144 percent of target.
 
 
 53
 We conclude that the district court's decision is amply supported by the record. RJRN used the conversion value to translate PIP and PSP targets to RSP targets; thus, the conversion was of "targets." In Austin's severance agreement, he specifically contracted to receive all incentive plan awards at target, as opposed to being paid at some specified sum, because he wanted his targets to be the same as those received by active senior executive employees. Austin knew that targets were adjusted frequently and almost always adjusted upward.
 
 
 54
 Austin did not contract, however, to have the payment of his awards adjusted for performance; instead, the payment was supposed to be equivalent to the target rate. The value of long-term incentive plan grants was determined in a two-step process. First, at the beginning of the three-year award cycle, RJRN established a target value of the grant, which was an expectation of what the grant might be at the end of the three years. In order to ascertain a target, RJRN necessarily had to consider past performance of the company.[4] Second, at the end of the cycle, the payment value of the grant was determined by adjusting the award based upon demonstrated actual corporate performance. Adjustment for performance could result in a payment in an amount higher than the target value if the company had a good year, or lower than the target value if the company had a poor one.
 
 
 55
 RJRN applied the 144% conversion factor to the PIP and PSP target values in order to compute a RSP target value for the two incomplete award cycles. Thus, the target changed and Austin should be granted his award based on the new target. Consequently, we do not find any error in the district court's conversion of Austin's target values for the two cycles.
 
 
 56
 After concluding that Austin was entitled to a conversion of his PIP and PSP awards to RSP at 144 percent of target, the district court applied the conversion factor of 144 percent to the PIP target award of $125,000 resulting in an award of $180,000 for the 1986 -1988 award cycle. Although the conversion of active employees to RSP involved the additional step of dividing the enhanced cash award by a share price of $45.68 to determine a number of shares of restricted stock, the district court refused to translate the cash award to Austin at the enhanced target to restricted stock. The district court deduced that such a translation of the enhanced cash award to restricted stock, and the resulting payment of the award at a price higher than $45.68 per share at the end of the award period, would be a performance-based adjustment not permitted by the severance agreement.
 
 
 57
 Austin has maintained that the district court's refusal to convert his incentive plan grants to restricted stock was error which resulted in a significant impairment of the payment value of his grants because the value of RJRN's stock more than doubled from the grant/conversion date to the date of the tender of shares under the leveraged buy-out proceedings (when RJRN was purchased by Kohlberg Kravis Roberts & Co.). He has claimed that he was entitled to participate in the incentive plans on the same level as active employees. Additionally, he has asserted that the grant of restricted stock did not constitute a performance-based adjustment, but simply the grant of a cash-equivalent award.
 
 
 58
 As a preliminary consideration, we recognize that the calculation of restricted stocks based on the current share price appears to be a performance-based adjustment. Furthermore, in light of RJRN's administration of its long-term incentive plans, the calculation was part of step two-payout of the grants. Since we accept the district court's finding that Austin contracted for his LTIP grants to be valued in step one but not in step two of the LTIP process (and thereby conclude that Austin is entitled to the 144% conversion in step one), we find no basis for concluding that the district court erred in finding that the award of restricted stock was part of step two. To do so would be to conclude that there was no second step.
 
 
 59
 Austin's severance agreement specifically stated that no company performance-adjustment would be made in his LTIP awards. A calculation of his awards based on the current price of company stock clearly would constitute such a consideration of the success or failure of the company in the three years of the award cycle. Therefore, the district court's conclusion is plausible in light of the record as a whole.
 
 
 60
 Accordingly, the district court's opinion and order are
 
 
 61
 AFFIRMED.
 
 
 
 [1]
 Even if RJRN had explicitly retained the discretionary authority to interpret the terms of Austin's severance agreement, we would not defer entirely to its interpretation, because it had a conflict of interest. We have held that
 when a fiduciary exercises discretion in interpreting a disputed term of the contract where one interpretation will further the financial interests of the fiduciary, we will not act as deferentially as would otherwise be appropriate. Rather, we will review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests of that conflict with those of the beneficiaries. In short, the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict.
 Doe v. Group Hospitalization & Medical Services, No. 92-2525, slip op. at 11 (4th Cir. Aug. 18, 1993) (emphasis added).
 In the present case, RJRN's proposed interpretation advances its monetary interests; therefore, we would closely scrutinize it even if RJRN had retained the authority to interpret its agreement with Austin. Since RJRN has not retained such discretionary authority, its interpretation is subjected to plenary review.
 
 
 [2]
 Austin's severance agreement with RJRN provides in relevant part:
 If during 1987 and 1988, the Company grants stock options, or comparable awards in lieu thereof, to its senior executive officers, you will be granted stock options, or if applicable, comparable awards in the target amounts established for your present employee grade level.
 (Emphasis added).
 
 
 [3]
 Some PIP and PSP awards remained pending because these plans operated on three-year cycles. In 1988, the 1986-1988 award cycle for PIP was pending. The pending PSP award was for the 1987-1989 cycle
 
 
 [4]
 For example, the RJRN Performance Incentive Plan, Article II, Sec. 2.1, provides for the consideration of performance in the setting of target values: Grant of Target Value. At the beginning of each Award Cycle the Chief Executive Officer of the Company shall recommend to the Committee the Target Value of Performance Awards for each Participant. After reviewing these recommendations, the Committee shall determine the Target Value of Performance Awards for all Participants. In making such determination, the Committee shall take into consideration the Participant's position level and responsibility, performance, potential, total cash compensation level and such other factors as it deems appropriate